[Civ. No. 3081.  Second Appellate District, Division One.—December 15, 1919.]

GEORGE W. HAZZARD, Appellant, v. JAMES M. JOHNSON et al., Respondents.

[1] CONTRACTS—AGREEMENT WITH PARTNERSHIP—FAILURE TO STATE FACTS—KNOWLEDGE OF BY PARTNER.—A person contracting with a partnership is not guilty of misrepresentation in not making known certain facts where those facts are known to one of the members of the partnership.

[2] MINES AND MINING—PERFORMANCE OF ASSESSMENT WORK—FAIL-URE TO FILE AFFIDAVIT—RIGHTS NOT IMPAIRED.—Where a person has been in possession of a mine for many years, following his purchase of the claim, and the assessment work has been done and paid for by him, the fact that he has not filed an affidavit showing the assessment work for a given year does not impair his rights in the premises.

[3] CONTRACTS—KNOWLEDGE OF RIGHT TO RESCIND—PROMPT ACTION REQUIRED.—A person entitled to rescind a contract must rescind promptly upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind. He may not wait to ascertain whether the transaction will be profitable to him, and so speculate upon the property and rights of the adverse party. This is particularly true in relation to contracts concerning mining property.

[4] ID.—PROMPTNESS IN RESCINDING—SECTION 1691, CIVIL CODE, MANDATORY.—The language of section 1691 of the Civil Code, requiring promptness in rescinding upon discovery of the fraud, is mandatory.

[5] ID.—DEFAULT IN MAKING OF PAYMENTS—TERMINATION OF LEASE—LAPSE OF RIGHT TO RESCIND.—Where, upon the failure of the lessees to make a certain payment as provided in a lease and option for the purchase of a mine, the parties enter into an extension agreement in which it is provided that the payment may be made by a given date from the proceeds of the mine, and that in the event the proceeds are insufficient to make said payment then, as a prerequisite to the further working of said mine, the lessees will make good the deficiency, and it is provided further that the only penalty for the failure to make said payment will be the forfeiture of any further right to continue under the lease, time being made of the essence of the agreement, upon the failure of the lessees to make such payment, the lease is at an end and the obligations of the lessor thereunder terminate, and the lessees have no right thereafter to rescind the transaction.

[6] ID.—CONTRACTING WITH KNOWLEDGE OF DEFECTS—ESTOPPEL TO USE FACTS AS GROUNDS FOR REPUDIATION.—Where parties, after entering into a lease and option agreement for the purchase of a mine with full knowledge of certain facts which will prevent the lessor from conveying a good title at the time, take possession and operate the mine until they find that the results of the enterprise are not satisfactory and then default in their agreement, they may not use those facts which were known to them and which would have prevented the lessor from conveying a good title had they elected to carry out the option to purchase, as justification for repudiating the contract, by asserting that the lessor was first in default.

APPEAL from a judgment of the Superior Court of San Diego County. W. A. Sloane, Judge. Reversed.

The facts are stated in the opinion of the court.

Wright, Winnek & McKee for Appellant.

Jas. G. Pfanstiel, Theron Stevens and Chas. G. Briggs for Respondents.

CONREY, P. J.—Plaintiff appeals from a judgment for $3,499.30, entered in favor of defendants Johnson, Willard, and Skeats upon their cross-complaint.

On December 11, 1915, the plaintiff, as party of the first part, and the defendants in their capacity as partners doing business under the firm name of North Hubbard Syndicate, as parties of the second part, entered into a contract in writing, whereby the first party leased to the second parties a certain "mine, mining claim and mining property" in San Diego County, known and described as the North Hubbard mine, "together with the appurtenances thereto," including various items of machinery, tools, and appliances, "also four buildings now upon said premises, to-wit: one engine house, one blacksmith shop, one boarding house and one bunk house." This lease was to run for a term of three years, beginning with December 15, 1915, "unless sooner forfeited or terminated through the violation of any covenants hereinafter against said lessees reserved, or through their failure to exercise their optional right to purchase said properties hereinafter given or to make the payments therefor strictly as hereinafter required." The lessees were "to pay the lessor the sum of one hundred dollars coincidently with the signing of these presents," and also certain royalties. It was further agreed that "upon the violation by said lessees or any person under them of any covenant or covenants herein reserved the term of this lease at the option of said lessor shall expire and the same and the said premises with the appurtenances thereto shall become forfeited to said lessor, and the said lessor or his agents may thereupon enter upon said premises and dispossess all persons occupying the same, and with or without force, and with or without process of law. Or at the option of said lessor the

said tenants and all persons found in occupation may be proceeded against as trespassers from the beginning of said term both as to royalty and the ore severed therefrom, or as guilty of unlawful detainer.''

''And in consideration of said initial payment of one hundred dollars, the party of the first part hereby gives to the parties of the second part the optional right, to purchase said mine, mining claim and premises, together with all the appurtenances and other property hereinbefore specified for the sum and amount of fifteen thousand dollars ($15,000.00) payable as follows: said one hundred dollars ($100.00) initial payment for rental in that event to apply on said purchase price, and the residue to be paid nineteen hundred dollars ($1900.00) on or before ninety (90) days from the date hereof''; the remaining $13,000.00 to be paid in three installments, the last payable on or before December 15, 1918.

''All or any of said payments may at the option of the lessees be made prior to the date on which they are herein required to be made, and all royalties to be paid to the lessor under the terms hereof, shall in the event of the exercise by the lessees of their optional right to purchase, apply upon the installments of the purchase price next to fall due.

''But it is hereby expressly understood and declared that this lease and agreement is made in contemplation of the exercise by the lessees of said option to purchase and not otherwise, and that in the event of the failure of the lessees to exercise said option or to make either or any of the payments of $1900.00, $3000.00, $5000.00 and $5000.00 hereinbefore specified strictly within the time allowed for so doing, such failure shall at the option of the lessor work a forfeiture not only of said option to purchase but of this lease as well; and any forfeiture of this lease by said lessees shall also at the option of the lessor work a forfeiture of said optional right to purchase, and all payments made shall be forfeited to the lessor and vendor.

''In the event of the exercise by said lessees of their optional right to purchase said property and of the payment by them pursuant to the terms hereof of the first two thousand dollars ($2000.00) of the purchase price in full, within the time herein provided for so doing, the lessor agrees coincidently therewith to make and deposit in escrow with

the bank at which payments are to be made, a good and sufficient deed of conveyance of said .premises and other property hereinbefore described, to said lessees, to be by such bank delivered to said lessees upon their full compliance within the time hereinbefore allowed for so doing with the terms of sale of said mine and property hereinbefore specified, and after full payment by them of the entire purchase price thereof.''

Under date of March 10, 1916, the parties made and executed an extension agreement whereby the plaintiff extended the time for making the said payment of one thousand nine hundred dollars for an additional sixty days over and above the time allowed by the original agreement. The time was thus extended to the tenth day of May, 1916. As one of the conditions of this extension, the lessees agreed ''that the gross proceeds of each cleanup of the working of said premises during the period of such extension up to the sum of $1900 shall be turned over to said George W. Hazzard for the purpose of making the said $1900 payment.'' It was further agreed that ''in the event the proceeds of the cleanups of the working of said premises during the period of such extension shall be insufficient to make said payment of $1900 then that as a prerequisite to the further working of said mine by the parties of the second part, said Johnson, Willard and Skeats will make good to said George W. Hazzard any deficiency in said $1900 payment; provided, however, that the only penalty for failure so to do will be the forfeiture of any further right to continue under said lease. This agreement is not intended to alter the terms of the arrangement between the four parties of the second part as between themselves, but is intended merely as an arrangement between them of the one part and said George W. Hazzard, as of the other.''

By his complaint the plaintiff alleged the execution of the said agreement and extension thereof, and further alleged that the defendants had not paid the sums due under the contract and had not delivered to plaintiff the proceeds of cleanups made on the mine as required by the contract and extension thereof; and demanded that the defendants be required to account for the proceeds of whatever things of value they had taken from the mine, and that plaintiff have judgment for the amount so ascertained.

At the time of the trial of this action the only proceeds of the mine not paid to the plaintiff consisted of certain bullion which by stipulation had been deposited in a bank in escrow pending the legal determination of the rights of the parties. Before the findings were filed this bullion was delivered to the plaintiff, who thereby obtained all that he was seeking to recover in this action.

The cross-complaint of defendants Johnson, Willard, and Skeats declares upon a cause of action for rescission of the contract. Facts are alleged showing that Hazzard and McHenry conspired together to deceive and defraud the cross-complainants; that Hazzard did not own the mine; that the buildings referred to in the contract were not on the mine, and did not belong to Hazzard; that the mine was subject to certain easements detrimental to its value; that these defects of title were unknown to cross-complainants until the twelfth day of May, 1916, and were concealed from cross-complainants; that relying upon Hazzard's representation that he owned and was able to convey all of said property, cross-complainants entered into the contract, took possession of the mine, and expended thereon various sums of money and much time and labor, to their damage, etc. It was further alleged that on May 24, 1916, and before Hazzard gave notice of his election to exercise his option, if he had any, to declare the contract of lease and option forfeited, cross-complainants gave notice of rescission, delivered the property to Hazzard, and demanded that Hazzard refund the moneys expended by them, and reimburse them for the time and labor expended by them on account of said lease and option; that Hazzard failed and refused to make such payment and reimbursement. Plaintiff Hazzard having answered the cross-complaint, the case went to trial on the issues tendered. The court made its findings and entered the judgment in favor of cross-complainants, from which judgment this appeal is prosecuted.

Some time prior to December, 1915, McHenry had been the owner of an interest in the North Hubbard mine as lessee and purchaser by virtue of certain contracts between him and Hazzard. This interest had expired. At the time of the commencement of the transactions here in question, McHenry had no interest in this mining property. He was anxious to obtain another lease and option to purchase and

Hazzard was willing to give him the opportunity. Under these circumstances, McHenry negotiated with cross-complainants and they entered into a partnership under the firm name of the North Hubbard Syndicate, for the purpose of leasing, purchasing, and operating the North Hubbard mine. The contract of lease and option and the extension thereof were made by Hazzard with this partnership. There is no evidence to sustain the court's finding that Hazzard well knew that McHenry was privately financially interested in the lease and option other than as a member of the partnership, and there is no evidence that such private and separate interest existed. The evidence shows without conflict that at all times from the beginning to the end of these transactions McHenry was fully acquainted with the facts concerning the title and condition of the mine and mining property, including the fact that no patent for the mine had been issued, that certain of the buildings described in the contract were located on an adjoining mine and not on the North Hubbard mine, and that the contract had been made which cross-complainants claim constituted a detrimental easement on the mining property. In its findings of fact the court found that Hazzard, for the purpose of inducing cross-complainants to execute the contract, falsely and fraudulently represented that he was the owner and entitled to possession of said buildings and that all of said buildings were located upon the mining claim; that cross-complainants relied upon such representations and believed them to be true, and were induced thereby to enter into the contract and the said extension thereof; that said representations were untrue and that Hazzard did not own either of said buildings and that three of them were not located on the mining property, but were located upon an adjacent mine not owned by him; that the fact that these buildings were not located upon the mining claim greatly lessened the value thereof and detrimentally affected its operation; that Hazzard was not the owner of the legal title to the mine, the title being during all of said times in the United States; that the North Hubbard mine has never been and is not a patented mine; that cross-complainants did not know at the time of entering into said contract and extension thereof that the plaintiff did not own the legal title to said mine and did not become informed

of this fact until May 12, 1916; that on the third day of April, 1914, McHenry, as owner of the North Hubbard mine, entered into an agreement with the owners of an adjacent mine purporting to create easements, servitudes, and encumbrances upon the North Hubbard mine and mining claim; that on the twenty-eighth day of April, 1914, McHenry, by conveyance from Hazzard, became the owner of Hazzard's interest in the North Hubbard mine and mining property; that on the twentieth day of May, 1914, McHenry and the owners of said adjacent mine, D. D. Bailey and Mrs. J. O. Bailey, duly acknowledged said written agreement before a notary public, and that subsequent to April 28, 1914, McHenry recognized and ratified said agreement; that the existence of said agreement was not made known to cross-complainants at the time of the execution of said lease and option to purchase said North Hubbard mine, nor thereafter until the twelfth day of May, 1916; that said written agreement remained in full force and effect at all of the times mentioned in the complaint and cross-complaint and greatly diminished the value of the North Hubbard mine and mining claim. It should be noted here that McHenry, in April, 1915, had reconveyed to Hazzard all of his interest in the property.

The court found that the evidence does not support the allegations of conspiracy stated in the cross-complaint between Hazzard and McHenry. But the court also found that McHenry did not, during any of the times covered by these transactions, act in good faith with his copartners "with reference to the representations and concealments aforesaid, and the said George W. Hazzard permitted the said J. M. McHenry to act as his representative in dealing with the said North Hubbard mine, at the time of the execution of the said lease and option to purchase said mine.''

The finding that the evidence does not support the allegation of conspiracy is undoubtedly correct. It may further be conceded, for the purposes of this decision, that McHenry did not act in good faith with his copartners, the cross-complainants. But we have searched the record in vain to find evidence sufficient to support the finding that Hazzard permitted McHenry to act as his representative at any time or in any manner in the course of these transactions. It was shown that Hazzard was very friendly toward

McHenry and was very willing to give him an opportunity to become interested a second time in this mine because the mine had been unprofitable to McHenry under his former lease; but it is perfectly clear from the evidence (and there is nothing to the contrary) that Hazzard dealt with Mc-Henry exactly on the same basis that he dealt with the cross-complainants; that is to say, he dealt with each and all of them equally as members of the copartnership with which he was making the lease and contract; and he had no knowledge or notice of any fact informing him or warning him that McHenry was not dealing in good faith with his partners.

[1]   The only evidence contained in the record of any representations made by Hazzard of the facts which he is charged with having misrepresented are the representations which might be implied by law from the fact that he made the lease and contract set out in the pleadings and said extension thereof.  Assuming that Hazzard had not yet obtained a patent for the mine and that some of the buildings described in the contract were not located on the mining claim, and that the mine was subject to the easements complained of by cross-complainants, there was no misrepresentation by Hazzard, since all of these facts were well known to McHenry, who was a member of the partnership with which the contract was made.  (Civ. Code, secs. 2429, 2332.)

[2]   So far as the title is concerned, the evidence is positive and uncontradicted that Hazzard had been in possession of the mine, subsequent to its location, ever since he purchased the claim in the year 1884.  The assessment work had been done for many years, and paid for by Hazzard. There was no contesting claim and he was in a position to obtain a patent whenever he would care to make proof and apply for it.  The fact that he had not filed an affidavit showing assessment work for the year 1915 (which work in fact had been done) did not, under these circumstances, impair his rights in the premises.  (Lindley on Mines, 3d ed., secs. 62, 688, 274.)

[3]   The cross-complainants were guilty of laches to an extent which deprived them of the right to rescind the contract on account of any of the alleged imperfections of title. A person entitled to rescind a contract "must rescind

promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind." (Civ. Code, sec. 1691.) He may not wait to ascertain whether the transaction will be profitable to him, and so speculate upon the property and rights of the adverse party. "In such a case a party cannot wait until time shall demonstrate whether the contract sought to be rescinded turned out to be good or bad; and this is particularly true in a new country, where values change rapidly." (*Hammond* v. *Wallace,* 85 Cal. 522, 531, [20 Am. St. Rep. 239, 24 Pac. 837].) It is also particularly true in relation to contracts concerning mining property. [4] . The language of the code, above stated, requiring promptness in rescinding upon discovery of the fraud, is mandatory. (*Marten* v. *Burns Wine Co.,* 99 Cal. 355, [33 Pac. 1107].)

[5] Cross-complainants did not attempt to rescind the contract until after the time allowed by the extension agreement had expired. Hazzard refused to further extend the time. This being so, and the required payment being not made, the lease was at an end, and by the terms of the contract the option expired with the lease. By failure to make the payment due on the tenth day of May, 1916, the defendants committed a breach which placed them in default and terminated the lessor's obligations. (*Schwerin Estate Realty Co. v. Slye,* 173 Cal. 170, [159 Pac. 420].) Time was expressly agreed to be of the essence of the contract.

[6] Cross-complainants contend that Hazzard was first in default, and that therefore their failure to pay within the stipulated time did not deprive them of the right to rescind. This contention is based upon the fact that their payments were to be made on or before the stated dates, and that therefore, by the terms of the contract, Hazzard was bound to be at all times ready to convey good title. *Burks* v. *Davies,* 85 Cal. 110, [20 Am. St. Rep. 213, 24 Pac. 613], and *Prentice* v. *Erskine,* 164 Cal. 446, [129 Pac. 585], are relied upon in support of . their argument. Giving full credit to these decisions, they are not applicable where, as we have found to be true here, the parties attempting to rescind made their contract knowing (the knowledge of one partner being the knowledge of all) all of the facts

on which they rest their claimed right of rescission. Having made their contract with those facts in view, and having taken into possession and operated the mine until they found that the results of the enterprise were not satisfactory, they should not then be permitted to use those same facts as their justification for repudiating the contract, by asserting that the adverse party was first in default.

The judgment is reversed.

Shaw, J., and James, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 12, 1920, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 13, 1920.

All the Justices concurred.