[Civ. No. 20563. Second Dist., Div. Three. June 24, 1955.]

PAUL B. SOGG et al., Appellants, v. LESTER J. HARVEY et al., Respondents.

Gitelson, Ashton, Moore & Coyle and Robert E. Moore, Jr., for Appellants.

Dulaney W. Palmer for Respondents.

VALLÉE, J.—Appeal by plaintiffs from an adverse judgment in a suit for rescission of a contract for the exchange of real properties on the ground of fraud or, in the alternative, for damages. Paul B. Sogg will be referred to as plaintiff. Lester J. Harvey will be referred to as defendant.

On July 11, 1951 plaintiffs Paul B. Sogg and Florence A. Sogg entered into a written contract with defendants Lester

J. Harvey and Clara Harvey by which the Soggs agreed to convey to the Harveys a parcel of realty in the county of Los Angeles in exchange for some mining claims in the county of Coconino, Arizona, and miscellaneous equipment thereon. A quarry was located on the mining claims from which stone was being produced. The exchange was consummated on August 21, 1951.

The complaint contains the usual allegations in an action grounded on fraud, charging numerous false representations by defendant with respect to the mining claims.

The court found: 1. Defendants did not make any of the representations alleged except certain ones which they had fulfilled and that they "did represent that the net profit from the operation of said quarry was at the time of the sale, Five Hundred Dollars ($500.00) per week." 2. "That it is not true that at the time of entering into the contract for the exchange of said properties plaintiffs had no knowledge or information concerning the management, operation or supervision of a stone quarry." 3. "That it is not true that plaintiffs obtained all their information and knowledge in respect thereto from the statements, assertions, representations, warranties and promises of defendants." 4. "That it is true that plaintiffs undertook an investigation of said facts before entering into the contract." 5. Plaintiffs did not rely on any representation of defendants in entering into the contract. 6. Plaintiffs did not, as alleged, for the first time between September 1951 and June 1952 discover that any representation of defendants was false, fraudulent, or untrue. 7. On July 3, 1952, plaintiffs caused a notice of rescission to be served on defendants Harvey. 8. The notice of rescission was not served promptly after plaintiffs discovered and had knowledge of all the true facts concerning the property and the profits thereof. 9. At the time of the exchange the parcel of realty exchanged for the mining claims had a value of not less than $33,000. 10. Plaintiffs have not sustained any damage. Judgment was for defendants. Plaintiffs appeal.

Plaintiffs' sole claim is that the findings are not supported by any substantial evidence. On the question of the right to rescind, it will be necessary to consider only whether the finding that plaintiffs did not give notice of rescission promptly after they discovered and had knowledge of all the facts concerning the quarry and the profits thereof is supported; since, if it is, it is sufficient to sustain the judgment decreeing that plaintiffs were not entitled to rescission.

On June 29, 1951, prior to entering into the contract, plaintiff made an inspection of the quarry. Before this visit he had contacted a Mr. Webster, an official of Western States Stone Company, and was told by Webster that the company would be interested in purchasing all the stone produced by the quarry. At the request of plaintiff, Webster suggested a foreman for the quarry whom plaintiff later employed. On July 25, 1951, prior to the close of the escrow for the exchange, plaintiff again visited and inspected the quarry with Webster and met the proposed foreman, a Mr. Beach, an experienced operator of quarries, and employed him. On this occasion Webster told plaintiff they could take production from the quarry up to one carload a day. Plaintiff told Webster he understood there was a set market on the stone, and asked if he could expect the prevailing market for his stone if the quality met with Webster's approval. Webster replied, "Yes."

Webster testified that within 30 days or 6 weeks from July 25, 1951, he again went to the quarry because "[i]t was understood that we were going to get a reasonable amount of material out there ot fill our orders; we had made commitments and they were not forthcoming, so I attempted to check as to why"; "Mr. Beach took me up to the quarries and he was having difficulty producing the grade of stone that we were demanding because of the checked formation that he was endeavoring to uncover"; he went to half a dozen diggings; the situation was general in that location as a whole; "[y]ou will find areas where perhaps a few tons can be taken out in large pieces and then you run into faults or flaws they call them." About the time of the exchange Western Stone bought 20,000 to 25,000 tons of stone from plaintiff. Webster testified it was "just fair" quality, that "We found it rather difficult [to meet specifications] because the majority of the stone would not meet the competitive market from a quality standpoint, so we were controlled by the volume we could move provided he produced it, which he didn't." There was evidence the quarry produced stone that had an excellent market and could be sold at any time.

When plaintiff first discussed the deal with defendant, defendant told him they were shipping a minimum of one car of 55 tons a week with a net profit of $10 or more a ton, or $500 or more per week, that there was about 300 years of good production with the present claims, and that the equipment was in excellent condition. Defendant also told him that

"you cannot depend on the help because of the type of men that come up and work" in that part of the country, and that water was a problem at the quarry, that there was no water there, and it was necessary to transport it 7 or 8 miles for the use of the men.

On November 14, 1951, plaintiff wrote to defendant stating that the equipment was in poor condition. Between August 28 and November 28, 1951, plaintiff was required to expend $1,782.95 for a new building on the property and to install a scale at a cost of $1,638.23. Between August 16 and December 15, 1951, he expended $519.36 for repairs to the equipment.

On November 27, 1951, plaintiff listed the quarry for sale. He testified he was interested in selling at that time because his interest in the quarry was lessening, he could not see any profit, he was operating at a loss, the equipment was not in good shape, and an expenditure of $10,000 was required to increase production to paying quantities.

Plaintiff discharged Beach in February 1952. He discontinued quarrying stone in February 1952 because "We found that the cost of production left no room for any margin of profit; I was going deeper into the hole at all times. The quality of the stone was such that I found a very difficult market. My main source, practically the only source that I had ever sold stone to, the Western States Stone Company, were raising objections to the quality of the stone and I was running into too many obstacles." He testified that by "too many obstacles" he meant "Cost of operation, the quality of the stone, the loss actually, of not making any money; you couldn't make any money there; I couldn't make any money there; I made a diligent effort to keep going; I had invested of my own money close to $7,000 at that time in money and I did not want to go into the red any further. Those were sufficient obstacles for me to stop. . . . The lack of good quality, sufficient salable, marketable stone." Between the time he acquired the quarry and the time he discontinued quarrying stone, his gross receipts were $6,880.81. He was at the quarry only half a dozen times from the date of his first visit until the trial.

Beach, plaintiff's foreman, testified he went to work for plaintiff about August 1, 1951; that in the first two months thereafter he inspected all of the quarry; the stone was inferior; it had "a soft texture, hard to process," you could not "obtain large enough pieces to make it marketable"; he

left in February 1952 because he had been there long enough to find out that he "could not operate for him [plaintiff] and make a profit." Beach further testified that plaintiff refused to permit him to operate the quarry in the way he felt it should be operated; that he told plaintiff it would cost $10,000 to put the quarry on a paying basis.

The notice of rescission was served on July 3, 1952. A party rescinding must rescind promptly on discovering the facts which entitle him to rescind. (Civ. Code, § 1691.) The requirement of prompt rescission is mandatory, and a party may not wait to see whether the contract turns out to be good or bad; and this is particularly true in relation to contracts relating to mining property. (*Hazzard* v. *Johnson*, 45 Cal. App. 19, 27-28 [187 P. 121].) Diligence is a condition of the right to rescind, and the right is lost by delay. (*Estrada* v. *Alvarez*, 38 Cal.2d 386, 391 [240 P.2d 278].) The transaction is ratified by failure to rescind promptly after discovery of the facts which entitle the party to rescind. (*Wilbur* v. *Griffins*, 56 Cal.App. 668, 677 [206 P. 112].) In *Campbell* v. *Title Guar. etc. Co.*, 121 Cal.App. 374 [9 P.2d 264], the court observed (p. 376):

"As was said in *Schneider* v. *Henley*, 61 Cal.App. 758, at 763 [215 P. 1036, 1038]: 'Subdivision 1 of section 1691 of the Civil Code requires prompt action in case of rescission. . . . In *Marten* v. *Burns Wine Co.*, 99 Cal. 355 [33 P. 1107], it was held that a delay of three months was too long. In the case of *Bailey* v. *Fox*, 78 Cal. 389 [20 P. 868], a delay of four months was held to be fatal, and in *Gamble* v. *Tripp*, 99 Cal. 223, 227 [33 P. 851], the Supreme Court said that a delay of four and a half months, in the absence of some excuse shown therefor, was certainly not the prompt action required by the code. From an examination of authorities, it would appear that thirty days is about the utmost length of time which the courts are disposed to allow to the purchaser for rescission unless there are unusual circumstances in the case excusing longer delay.' "

In *Estrada* v. *Alvarez, supra*, 38 Cal.2d 386 [240 P.2d 278], it is said (p. 391):

" 'There have been many cases in which delays for much shorter periods than a year have been held to be fatal to the right to rescind.' (*Clanton* v. *Clanton* (1942), 52 Cal. App.2d 550, 556 [126 P.2d 639], and *King* v. *Los Angeles County Fair Assn.* (1945), 70 Cal.App.2d 592, 596-597 [161 P.2d 468], which collect some of those cases; see, also, *Camp-*

*bell* v. *Title Guarantee, etc. Co.* (1932), 121 Cal.App. 374, 377 [9 P.2d 264] ; *Schneider* v. *Henley* (1923), 61 Cal.App. 758, 763 [215 P. 1036] ; *Brown* v. *Domestic Utilities Mfg. Co.* (1916), 172 Cal. 733, 737 [159 P. 163] ; *Ferguson* v. *Edgar* (1918), 178 Cal. 17, 19 [171 P. 1061].)''

▪ Whether a party claiming to have been defrauded has rescinded promptly depends on the circumstances of the particular case and is a question primarly for the trial court. (*French* v. *Freeman,* 191 Cal. 579, 589 [217 P. 515] ; *Noll* v. *Baida,* 202 Cal. 98, 105 [259 P. 433] ; *Esau* v. *Briggs,* 89 Cal. App.2d 427, 438 [201 P.2d 25].) It is a question of fact. (*Miller* v. *Eisenberg,* 90 Cal.App.2d 479, 482 [203 P.2d 11].) The conclusion of the trial court will not be set aside by a reviewing court if it finds reasonable support in the evidence. (*McCray* v. *Title Ins. & Trust Co.,* 12 Cal.App.2d 537, 538 [55 P.2d 1234].)

▪ Viewing the evidence and the reasonable inferences that may be drawn therefrom in the light most favorable to defendants and disregarding conflicting evidence and inferences, it is manifest we cannot say, as a matter of law, that the trial court's finding that the notice of rescission was not served promptly after plaintiffs discovered and had knowledge of all the true facts concerning the quarry and the profits thereof is without support in the evidence. A conclusion may be derived from the evidence that at least as early as February 1952 plaintiff had knowledge of all the facts with respect to the quarry and, if his testimony is to be believed, that he then knew the representations with respect to its productivity and profits were untrue. The trial court may even have fairly inferred that he learned all the facts as early as November 1951. Plaintiffs did not give notice of rescission until July 3, 1952. They did not act with reasonable diligence.

As we have noted, the court found that plaintiffs did not sustain any damage. They contend the finding is without evidentiary support. The complaint alleged that the property plaintiffs exchanged for the quarry had a value of $33,000 ; that the quarry was of no value to plaintiffs over and above the value of the movable personal property; that they sustained damages in the sum of $33,000. Defendants answered these allegations thus: ''defendants deny generally and specifically each and every allegation therein contained.'' Plaintiffs assert that the denial is a negative pregnant and constituted an admission of damage in the amount of $32,999.

■ The cause was tried on the theory that the denial was sufficient and that the question of damages was in issue. Assuming, without deciding, that the denial is a negative pregnant, the point was waived. (3 Cal.Jur.2d 618, § 149.)

■ There was evidence that the property which was exchanged for the quarry had a value of about $33,000 at the time of the exchange. On November 27, 1951, plaintiff listed the quarry and equipment with a real estate broker and granted him the right to sell it for $60,000. At the time he gave the listing plaintiff stated to the broker "that he felt he did not have the proper management and that he was concerned about the way the operation was going on, the things that were happening at the quarry concerning his superintendent, Mr. Beach . . . that Mr. Beach, he felt, was not doing a good job and that he was misusing the funds and taking advantage of his being absent, and that he did know that Mr. Beach was selling stone on the side, that he had received no money for, and just in general that he was pretty disgusted with the whole thing." In a letter to the broker dated November 29, 1951, plaintiff stated:

"My superintendent Mr. A. A. Beach informs me that he can easily quarry 150 tons per week of assorted flagstone and should by the first of the year, 1952, attain 200 tons weekly. From my observations with all the product being sold and desired by the Western States Stone Company, with proper supervision, which I am unable to do, owing to my other varied activities, the profit per average ton should be $5.00."

A qualified expert testified that the value of the quarry alone was $22,500. There was evidence that the value of cabins and equipment on the property was $19,000. The finding that plaintiff sustained no damage is amply supported by the evidence.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.