[S. F. No. 7906. Department Two.—March 19, 1918.]

## GEORGE N. SEYMOUR, Respondent, v. JOHN SALS-BERRY, Appellant.

CORPORATIONS—PLEDGE OF STOCK—VALIDITY BETWEEN PARTIES—ENTRY UPON BOOKS OF CORPORATION UNNECESSARY.—A pledge of corporation stock by indorsement and delivery of the certificate is valid between the parties and as against all other persons, except purchasers in good faith, for value and without notice, without the entry of the transfer of the stock upon the books of the corporation.

ID.—DELINQUENT STOCK SALE—STATUS OF PURCHASER—CONSTRUCTIVE TRUSTEE.—On a sale of corporation stock for a delinquent assessment, the purchaser is to be regarded as the constructive trustee of the owner of the stock, and not as the purchaser thereof in his own right, where there had been previous negotiations between the owner and such purchaser relating to the purchase of other stock of the same corporation for their common benefit, and the purchaser attended the sale in response to a telegraphic message from the owner, to which he did not make reply, requesting him to pay the delinquent assessment.

ID.—SALE OF PLEDGED STOCK—PURCHASE AS AGENT OF PLEDGOR—RIGHTS OF PARTIES.—Upon a sale of pledged stock for nonpayment of an assessment, the purchaser acquires no right therein superior to that of the pledgee where he acts as agent for the pledgor in the purchase, since the pledgor himself could not have acquired any interest in the stock adverse to the pledgee.

ID.—AGREEMENT TO REFRAIN FROM COMPETITIVE BIDDING—FRAUD.—An agreement between persons at a delinquent stock sale to refrain from competitive bidding is collusive and inequitable, and the parties will not be permitted to retain the fruits of the transaction.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. George E. Crothers, Judge.

The facts are stated in the opinion of the court.

J. P. O'Brien, for Appellant.

Willard P. Smith, and B. B. Blake, for Respondent.

MELVIN, J.—Defendant Salsberry appeals from an adverse judgment and from an order denying his motion for a new trial.

Defendant Sward, against whom judgment by default was entered, owned on November 27, 1909, ten thousand shares of the stock of the International Eucalyptus Association of California standing in his name upon the books of that corporation. On that day he pledged the stock by indorsement and delivery of the certificates representing it to plaintiff Seymour as security for the payment of a note of even date. By the terms of the indorsement upon the certificates the transaction was nominally a sale, assignment, and transfer of the stock. No transfer of the stock to plaintiff was made on the corporation's books and no notice of any sort was given regarding the hypothecation of the shares. In May, 1912, an assessment of one cent a share was levied upon the capital stock of the corporation and the shares owned by Sward were sold to John Salsberry, appellant herein, on August 6, 1912, at a delinquent sale for nonpayment of this assessment.

It appears that Sward, absent from the state of California, learning of the assessment, sent to Salsberry the following telegram:

"Chicago, Ill. Aug. 5th–12.

"John Salsberry, care Hotel Sacramento, Sacramento, Calif.

"Oakes stock has assessment one cent share payable tomorrow. Go fifty cents. Will you pay James Warrack Secretary hundred ninety dollars assessment stock my name and Geo. Albert will send check full amount. Please wire today.

"JOHN W. SWARD. 4 P. M."

Salsberry did not reply to this communication but he went to Sacramento admittedly for the purpose of buying certain shares known as the "Oakes Stock" and also with the intention of paying the assessment on the stock owned by Sward; but on August 6, 1912, at a delinquent sale, he purchased Sward's stock, which was accordingly transferred to him on the books of the corporation. It is admitted by the appellant that at the time of said sale there was a friendly understanding amongst the bidders present that Salsberry would bid in the Sward stock and the others would bid in the rest of the stock sold. But appellant's counsel says that no binding agreement was entered into having this effect and none of the parties was bound by any such agreement. The following year another assessment was levied on the ten thousand shares, amounting to $125, and was paid by Salsberry.

On May 13, 1914, plaintiff tendered to Salsberry the aggregate of the amount paid at the delinquent sale and upon the subsequent assessment and also a sum asserted to be the equivalent for interest and costs, and demanded that Salsberry transfer the stock to him. Compliance with this demand being refused, plaintiff sued to compel such delivery and to require the corporation to reissue the stock to said plaintiff in his own name.

The findings and judgment were in favor of the plaintiff. Appellant contends that the evidence is insufficient to justify the court's determination that the defendant Sward directed or employed him to pay the delinquent assessment upon the stock and that appellant promised to do so; that an agreement was made between the bidders at the delinquent sale to depress the price paid for the stock, and that such agreement amounted to fraudulent conduct which would vitiate the sale; and that Salsberry had notice, implied or otherwise, of Seymour's interest in the stock and of the invalidity of the sale under the assessment.

Preliminary to these objections, however, is the suggestion on the part of appellant's counsel that respondent's title to the stock is not good, because of his failure to give notice of its transfer to him, but undoubtedly it is the rule that such a transfer as was here made of stock of a corporation is good as against all subsequent claimants except purchasers in good faith for value and without notice of the equities. For the operation of this rule it is not necessary that an entry of the transaction be made on the books of the corporation. (*Brown v. San Francisco Gas Light Co.*, 58 Cal. 426.) The case of *National Bank of the Pacific* v. *Western Pacific Ry. Co.*, 157 Cal. 573, [21 Ann. Cas. 1391, 27 L. R. A. (N. S.) 987, 108 Pac. 676], is authority also for this rule as applicable to pledges. It follows as a logical consequence of this rule that the transaction having effected a valid pledge as between the parties, the pledgee may claim the property so pledged from third persons by suit if necessary, unless they have a higher equity or other superior right to his own. (*Herbert Kraft Co. Bank* v. *Bank of Orland*, 133 Cal. 64, [65 Pac. 143]; 31 Cyc. 842.) As was said in *Spreckels* v. *Nevada Bank of San Francisco*, 113 Cal. 272, [54 Am. St. Rep. 348, 33 L. R. A. 459, 45 Pac. 329], by Mr. Justice Henshaw, who delivered the opinion of the court, in commenting upon the effect of

section 324 of the Civil Code with reference to the necessity for an entry of a transfer of stock upon the books of a corporation: "Even without entry upon the books of the corporation, such a transfer is valid as against all but innocent purchasers and transferees in good faith, for value, and without notice." And in the same opinion he used the following language: "It is not the law of this state, nor is it the law generally, that a transfer upon the books of the corporation is essential to the creation of a valid pledge. (Civ. Code, sec. 324; *Graves* v. *Mono Lake etc. Min. Co.*, 81 Cal. 303, 325, [22 Pac. 665]; *National Bank* v. *Watsontown Bank*, 105 U. S. 217, [26 L. Ed. 1039]; Cook on Stocks and Stockholders, sec. 465.)" Therefore, if respondent proved a superior equity in the stock to that possessed by appellant, the judgment must stand.

Turning now to the first finding attacked, we are of the opinion that it is amply supported by the evidence adduced at the trial.

From the testimony of appellant himself it appears that he met Sward in the fall or winter of 1911 and 1912 and that they were very friendly toward the latter part of their association. Sward proposed to Salsberry that the latter should furnish the money to purchase certain interests in the International Eucalyptus Association which Sward believed he could get for a very small price. Speaking of their relations with reference to this matter the appellant, when on the witness-stand, said: "He had to make a trip east and on his return, why, I was going to take this proposition up with him of buying the stock, putting up the money, and we were to share alike in the profits after I had received my interest and principal back. But somehow or another he was a little longer in the east than he had anticipated, and he sent me these wires. So I went over to Sacramento and purchased the Oak stock." One of the telegrams to which appellant referred was the one from Sward quoted above. It also appears from Salsberry's testimony that the telegram was the first intimation which he had of the contemplated sale of Sward's stock for the delinquent assessment. The telegram, he said, was the inducement which caused him to stay over in Sacramento, where he had gone to buy shares at the sale of Oakes' property on August 5, 1912. He remained there until the following day in order to pay Sward's assessment

or bid at the sale.  Regarding his attendance at the sale on
the 6th he said: "I went over to pay, as you call it, the as--
sessment on the Sward stock, but, in the meantime, I had
found I was in bad with Sward.  So in place of leaving the
stock stand in Sward's name, I bought it outright."  Mr.
Ennis, who was present at the sale, testified that Mr. Sals-
berry said he was in Sacramento "to act for Mr. Sward."
To another witness appellant said, according to the testimony,
that he originally intended to pay the assessment when he
received the message from Sward.

Appellant's counsel contend that this evidence falls far
short of proving that Salsberry in purchasing the stock con-
stituted himself a trustee for Sward.  Regarding the tele-
gram they assert that it was "a mere request from Sward
not accepted by Salsberry."  We cannot assent to this view.
That there had been negotiations between Sward and Sals-
berry regarding the purchase of stock of this very corpora-
tion was the statement of appellant himself.  True, there was
no written agreement between them, but there was an un-
derstanding.  Asked to explain this understanding Mr. Sals-
berry said: "The idea was for me to give the money, that
I was to purchase the stock and get my money at plus six
per cent, and half of the profits.  That was all that was
said outside of an alluring proposition to me."  It is argued
by appellant's counsel that the mere receipt of the telegram
by their client and his action upon it did not create an
agency.  But there was here present more than a mere re-
quest from a stranger for a favor.  It related to the very
stock about which there was an agreement that Salsberry
would "take up the proposition of buying" it for their com-
mon benefit.  Coupled with this request was another with
reference to the payment of the assessment on Sward's shares.
Under the circumstances, considering the relations between
the parties, the prompt compliance with the part of the re-
quest which related to paying the indebtedness, coupled with
the fact that there was no refusal to assent to the other part
of the importunity, namely, that the payment should be for
Sward's benefit—all of these things justified the court in
holding that a constructive trust was created in favor of
the sender of the telegram.  True, there was no formal con-
sent on Salsberry's part to act for Sward in compliance with
the telegram.  But this was a case where two homely maxims

may be justly applied, namely, "Actions speak louder than words" and "Silence gives consent." Salsberry's agreement to pay the assessment for the man with whom he had been negotiating was implied from the admitted facts of the case. Upon receipt of Sward's telegram it was his duty either to pay the assessment or to notify Sward that he declined to do so. (Civ. Code, sec. 2224; *Frost* v. *Perfield,* 44 Wash. 185, [87 Pac. 117]; *Samonset* v. *Mesnager,* 108 Cal. 354, [41 Pac. 337].) In *Frost* v. *Perfield* the essential facts were as follows: One of the plaintiffs had written from Alaska to the defendant in Washington, to look up and pay her taxes upon certain property in Pierce County. The defendant went to Tacoma and was informed that the property had been sold to the county for delinquent taxes. He did not answer plaintiff's letter; she again wrote to him the following year making the same request, whereupon he again made inquiry and learned that the property would be sold by the county soon after. He then wrote to Mrs. Frost, telling her that he intended bidding in the property if it did not sell too high. He did bid in the property, taking it in his own name. Upon being tendered the amount which he had laid out he claimed to hold the property in his own right. The court held, however, that by acting upon the information which he received from the plaintiff, the defendant constituted himself her agent and could not acquire interest in the land adverse to her. The language of the court is peculiarly applicable to the case at bar. "When he received that letter, it was optional with him whether he would comply with their request or not. He could have declined to do anything in the matter, or he could have written and told them to secure the services of some other person. Instead of doing this, he complied with the request to the extent of going to Tacoma and making inquiries at the county treasurer's office relative to these taxes. When he did this, he constituted himself the agent of appellants. Upon receiving the second letter, he again visited the treasurer's office and ascertained the condition of the property with relation to the taxes. When he wrote to Mrs. Frost and told her the condition in which he found the property, it was in answer to her letter requesting him to investigate the matter, and she had a right to suppose that he was acting not only at her request but in her behalf. In view of the relationship existing between the parties, and

of all the circumstances, we think that he was not justified in buying in the property for himself without plainly informing the appellants of that intention." The relationship referred to in the above quotation was that of landlord and tenant, but it does not appear that it was any closer than the relationship existing between Sward and Salsberry.

As Sward's agent Salsberry could acquire no superior right to that of Sward. Sward could not have acquired any interest in the property adverse to Seymour, and Salsberry, having accepted the duty of acting for Sward, could not obtain any such right. (*Smith* v. *Goethe*, 147 Cal. 725, [82 Pac. 384].)

Our conclusion on this branch of the case makes it unnecessary to indulge in any extended discussion of the other two objections made by appellant to the sufficiency of the evidence. Indeed, as Salsberry purchased and held the stock here involved as trustee for Sward, it makes no real difference whether or not there was an agreement by the people present at the sale not to bid one against another. However, there was abundant evidence of such an understanding. Mr. Henderson, one of the witnesses, testified that he told Mr. Salsberry that people had come to the sale prepared to bid on the stock. Mr. Salsberry said that he would get the stock even if he had to take a mere hundred shares for the hundred dollar assessment, and that he would rather have the stock remain in Mr. Sward's hands than allow some of the others interested in it to purchase the stock. After some further talk in which Mr. Salsberry said that he merely wanted to protect himself in view of the fact that he had already bought the stock formerly owned by Oakes, Mr. Henderson said that by suggesting that purpose to the people present he thought he could prevent them from bidding on Sward's stock. "He finally decided that was pretty fair," said the witness. And describing the result of the understanding established among the people present at the sale, he said: "I bid on the parcels other than the Sward stock, and the stock was sold to me for the amount of the assessment, plus the accrued costs." And speaking of appellant's benefit by the arrangement, he also testified: "When the ten thousand shares of stock belonging to Mr. J. W. Sward were put up for sale, Mr. Salsberry bid them in at the cost of the assessment, plus the accrued costs." Appellant's story of the sale corrobo-

rates that of Henderson. He tells of mutual threats to engage in competitive bidding, but finally, to use his own language, "we got together and compromised." There was also testimony to the effect that someone other than Henderson or appellant bid on some of the stock offered, but withdrew his bid "after everything was arranged." We are of the opinion that the evidence justified the court's conclusion that the arrangement to refrain from competitive bidding was collusive and inequitable. Equity will not permit parties to such a transaction to retain the fruits thereof. (2 Perry on Trusts, sec. 828; *Scott* v. *Sierra Lumber Co.*, 67 Cal. 71, [7 Pac. 131].) There was a conflict of testimony regarding the value of the stock, but sufficient basis appears in the evidence for the finding that the price paid by Salsberry was grossly inadequate to the real value.

The finding that Salsberry was chargeable with knowledge of respondent's title to the stock standing in Sward's name is not essential to the judgment, and therefore need not be discussed. Since appellant was not a purchaser of the stock in good faith and for value, he may not retain it as against respondent.

The judgment and order are affirmed.

Wilbur, J., and Victor E. Shaw, J., *pro tem.*, concurred.