[L. A. No. 18495. In Bank. Dec. 23, 1944.]

THOMAS PORTER NEET et al., Appellants, v. KENNETH A. HOLMES et al., Respondents.

Wm. Ellis Lady, W. I. Gilbert, Jr., Finlayson, Bennett & Morrow and Frank G. Finlayson for Appellants.

Ralph D. Brown, Joseph Doyle, Geo. I. Devor and Geo. L. Reimbold for Respondents.

SHENK, J.—The plaintiffs have appealed from a judgment of dismissal following an order sustaining demurrers to the second amended complaint without leave to amend. The action is to rescind a mining lease and to establish a constructive trust of mining claims on the ground of the alleged fraud of certain of the defendants.

The original complaint was filed August 28, 1940. The final amended complaint contained four causes of action. The following appears from the allegations thereof:

In 1896 Mary E. Greathouse was the owner of the 55/100ths interest in three patented mining claims, known as the Padre,

Madre and Cargo Muchacho, located in what was then a part of San Diego County but later became Imperial County. She died in the State of Kentucky in 1906. The plaintiffs are her successors and the present owners of said 55/100ths interest.

Kate S. Wright was the owner of the remaining 45/100ths interest' in those patented mines, and later this interest was held by her jointly with her husband, the defendant Sumner B. Wright. On her death in 1938 her husband and his assigns succeeded to her interest. The latter were made defendants in the action because they declined to join in the complaint.

Early in 1935 the defendants Kenneth A. Holmes and Edmund A. Nicholson examined the mining property and the tailings thereon. They communicated with the defendant Ray H. Fitzgerrell, an attorney whose wife is a niece of the Wrights. They advised him of their examination and of their opinion that the mines were valuable, that large sums of money could be made from their operation if possession and permission to work them could be obtained. Fitzgerrell, with the assistance of Sumner B. Wright, inspected the Imperial County records and learned that Mary E. Greathouse was the record owner of the 55/100ths interest in the mines. The expense of the inspection trip to Imperial County was borne by the defendants Holmes and Nicholson. Thereupon the Wrights conveyed their interest to Fitzgerrell without consideration. Fitzgerrell and Nicholson conducted an investigation financed by Holmes and Nicholson to ascertain the whereabouts of Mary E. Greathouse. They learned that she had died in Versailles, Kentucky. At the expense of Holmes and Nicholson, Fitzgerrell journeyed to Kentucky for the purpose of locating the Greathouse heirs and obtaining control of their interest in the mines. On March 1, 1935, Fitzgerrell met the plaintiff Thomas Porter Neet, at Versailles, Kentucky. He represented to Neet that the properties in Imperial County, California, were old worked-out mines, of little or problematical value, a mere gamble and of no real or substantial merit; that he did not know of any one interested in the mines, did not have in mind any prospective operators, and that he was making the trip at his own expense on behalf of his relatives, the Wrights, to investigate the possibility for future action; that if a way could be found to consolidate all the interests in the claims he would devote his time to the matter in order to be helpful to

the Wrights. He suggested that the interests of the various owners be transferred to a corporation to be formed; that Thomas Porter Neet should be one of the directors but that he could sign necessary consents in blank without the necessity of taking active part in the management in California; and that the management could safely be entrusted to him, Fitzgerrell. Fitzgerrell also represented to Neet that he would locate or cause to be located, for the benefit of the owners and the advantageous operation of the mines, certain claims on the contiguous public domain. After the interview with Neet, Fitzgerrell entered into correspondence with the other plaintiffs, Robert Clarence Schenck and Mary Greathouse Hickman Glenn, who also resided outside the State of California, and made to each of them substantially the same representations.

About March 12, 1935, a corporation known as Rayfitz Company was organized. Costs of incorporations were paid by Holmes and Nicholson. Five directors were elected, consisting of Ray H. Fitzgerrell, his daughter Peggy Fitzgerrell, C. Fuller Peters, Paul R. Peters, and the plaintiff Thomas Porter Neet. Ray H. Fitzgerrell was elected president; C. Fuller Peters, vice-president; Peggy Fitzgerrell, secretary and treasurer; and Jessie B. Fitzgerrell, wife of Fitzgerrell, assistant secretary. Thomas Porter Neet took no active part in the management of the affairs of the company in California.

About May 17, 1935, the plaintiffs conveyed their 55/100ths interest in the patented mines to the Rayfitz Company in return for fifty-five shares of the capital stock, and Fitzgerrell transferred to the company the remaining 45/100ths interest conveyed to him by the Wrights and received forty-five shares of stock. Those one hundred shares were the only shares issued by the company.

On August 7, 1935, the Rayfitz Company leased the patented mines to the defendants Holmes and Nicholson, for a term of five years. The consideration was $700 in cash and royalties of from 10 to 20 per cent of the returns based on the amount of recovery per ton. The plaintiffs were not then advised of the terms of the lease, but were informed by Fitzgerrell that the lease was fair to the company and the stockholders. On those representations the plaintiffs gave their written consent to the transaction.

During the course of examining and operating the mines

the defendants considered that it would be good mining practice, as well as profitable and advantageous, to mine the surrounding territory in conjunction with the patented claims. They discovered that the veins located on the patented mines extended into the surrounding territory and that the owners of the mines possessed the apex rights with respect thereto. Between April 17, 1935, and April 15, 1939, they located nineteen claims in adjoining territory, all of which were taken in the names of Holmes and Nicholson or their agents.

Letters from the plaintiffs to Fitzgerrell remained unanswered and in 1938 the plaintiffs started an investigation. At the February, 1938, meeting of the stockholders they elected new directors and officers and took over the control of the company's affairs. The investigation terminated in October, 1938, and disclosed to the plaintiffs the following facts: 1. That Fitzgerrell had received funds from Holmes and Nicholson to finance the inspections and trips east. 2. That Fitzgerrell was receiving a salary of $200 a month from the corporation for his services. 3. That operations under the lease were extensive. 4. That outlying property including a mill and millsite had been acquired with corporate funds. 5. That numerous claims had been located in the contiguous outlying territory for the personal benefit of Holmes and Nicholson. In November, 1938, the Rayfitz Company and the plaintiffs gave notice of rescission of the lease and demanded surrender of the premises and an accounting. In June, 1939, the plaintiffs gave notice to the Rayfitz Company rescinding the conveyances of their 55/100ths interest in the patented mines, and the owners of the remaining 45/100ths interest gave a similar notice. Pursuant to those notices reconveyances of the interests were executed by the Rayfitz Company and delivered to the former owners or their assigns.

The defendants did not comply with the notice of rescission of the lease or the demand for surrender of the premises. Subsequent to the receipt of the notice the defendants made royalty payments to an attorney acting on behalf of the plaintiffs, who accepted them "without prejudice" to the plaintiffs' rights.

Royalties paid under the lease between August 7, 1935, and January 1, 1937, amounted to $1,608.19; and between January, 1937, and September, 1937, to $2,925.79. During

the period between March, 1938, immediately after control of the corporation was taken over by the plaintiffs, and October, 1938, the sum of $607 was paid in royalties. From November, 1938, when notice of rescission was given and demand for surrender of the premises was made, to November, 1939, $26,876.26 in royalties were paid. The defendants remained in possession and operated the leased premises until the termination of the lease on August 7, 1940, when they surrendered possession. Before the end of the same month the present action was commenced.

The first cause of action, for money had and received in the sum of $550,000, was dismissed.

The second cause of action is to enforce rescission of the lease. It is based on fraud and conspiracy alleged to have been committed against the plaintiffs by Fitzgerrell, Holmes and Nicholson (hereinafter referred to as the defendants), whereby the plaintiffs were induced to part with their property, and which it is claimed rendered the lease void *ab initio*. The plaintiffs assert damages to the extent of 55/100ths of all ores mined during the leasehold period and which they estimate to be of the total value of $1,000,000.

There is no third cause of action in the second amended complaint.

The fourth cause of action, also subsequently dismissed, was based on the alleged negligence of the defendants in timbering additional tunnels, shafts, stopes, drifts and other underground workings whereby a certain portion of the mines caved in, to the plaintiffs' alleged damage in the sum of $110,000.

By the fifth cause of action the plaintiffs seek to establish a constructive trust as to the additional claims located and acquired in the names of Holmes and Nicholson, for a conveyance of the same to the plaintiffs to the extent of their interest in the patented mines, and for an accounting of all ores taken therefrom.

The trial court in sustaining the demurrers to the second cause of action determined that the plaintiffs had not stated facts sufficient to constitute a cause for rescission of the lease; that the plaintiffs were guilty of laches; that by their conduct they had waived the right of rescission; and that the alleged cause of action was barred by the provisions of section 338, subdivision 4, of the Code of Civil Procedure. The demurrers to the fifth cause of action were sustained for want of sufficient

facts, and on the additional ground that any right to relief was barred by the statute of limitations as to all of the claims except those located within three years prior to the filing of the original complaint.

The plaintiffs contend that the facts stated in the second and fifth causes of action entitle them to the relief sought thereby.

### THE SECOND CAUSE OF ACTION.

The plaintiffs do not seek an accounting of expenditure of corporate funds, or of royalties under the lease. They do not contend that the royalties actually received by them were not the full amount due them if the validity of the lease be assumed. They stand upon their repudiation and rescission of the lease and their claim that the alleged conspiracy to defraud them of the possession and control of the mines voided the lease absolutely, and that as a consequence they are entitled to receive as damages the value of the ores actually taken from the mines during the period of operations to the extent of their 55/100ths interest. As ground for rescission they depend entirely on the allegations of concealment from them by Fitzgerrell of the terms of the lease, and his representation that the lease was fair. They alleged that those representations were false and that the lease was in fact unfair, basing their contention on the alleged false representations that the claims were old worked-out mines and had only a problematical value. They allege that they would not have parted with their property for stock in the corporation had they known the falsity of those representations, that is, had they known that the mines were valuable, and that the alleged falsity resulted in an unfair lease. But the plaintiffs have effected rescission of the transfers of their property to the Rayfitz Company and have obtained a reconveyance of what they conveyed to the corporation. In order to enforce their attempted rescission of the lease (assuming they were proper parties to make the rescission and bring the action), they must allege facts showing that the lease was unfair and resulted in damage to them. They do not, however, allege wherein the lease executed by the Rayfitz Company with their consent was unfair. Their conclusion that the lease was unfair does not necessarily follow from the alleged false representation that the mines had only a problematical value.

They have not stated facts which would indicate that a lease calling for royalties of from 10 to 20 per cent to the lessors from whom nothing in the way of direct contribution to expenses, material, or labor was required, would not be a fair arrangement in the event the plaintiffs had been informed that the mines had some other value. There is therefore an absence of allegations sufficient to establish that the lease was fraudulent, or unfair, or resulted in damage to the plaintiffs.

Assuming, however, that fraud was sufficiently alleged, the facts otherwise alleged are support for the trial court's conclusion that the plaintiffs were guilty of laches and by their conduct waived a right to rescission. The plaintiffs alleged acceptance of monthly royalty payments pursuant to the lease after giving notice of rescission, and they delayed bringing the action until the provisions of the lease had been fully performed and the term thereof had expired.

When the right to rescind exists section 1691 of the Civil Code prescribes the method of procedure which must be followed. (*Zeller* v. *Milligan,* 71 Cal.App. 617, 622 [236 P. 349].) Those requirements include a prompt rescission upon discovery of the right to rescind and restoration of everything of value received under the contract.

Promptness in rescinding is especially applicable to contracts concerning mining property. (*Hazzard* v. *Johnson,* 45 Cal.App. 19, 28 [187 P. 121].) In that case, where the attempt to rescind was not made until after the expiration of the contract, it was said that a party may not speculate as to the outcome, and thus wait until time shall demonstrate whether the contract sought to be rescinded turned out to be good or bad. In *Hogan* v. *Anthony,* 52 Cal.App. 158, 166 [198 P. 47], it was said that a party to a contract who wishes to rescind cannot play fast and loose. He cannot conduct himself so as to derive all possible benefit from the transaction and then claim the right to rescind.

The general rule, with certain exceptions not applicable to the facts involved in this case, is that the offer to restore what has been received under the contract is a condition precedent to maintaining an action founded on the assumption that rescission has been accomplished by the act of the party. (See *McCall* v. *Superior Court,* 1 Cal.2d 527, 535 [36 P.2d 642, 95 A.L.R. 1019]; *Hellman Commercial T. & S. Bank* v. *Alden,* 206 Cal. 592, 605 [275 P. 794]; *Westerfeld* v.

*New York Life Ins. Co.,* 129 Cal. 68, 84 [58 P. 92, 61 P. 667].)
█ The right to rescind may be waived. (*Harrington* v. *Patterson,* 124 Cal. 542 [57 P. 476] ; *Bryan* v. *Baymiller,* 95 Cal.App. 481 [272 P. 1106].) It is waived by recognition of the existence of the contract after the right to rescind was created. (*Bryan* v. *Baymiller, supra.*) █ Waiver of a right to rescind will be presumed against a party who, having full knowledge of the circumstances which would warrant him in rescinding, nevertheless accepts and retains benefits accruing to him under the contract. (3 Black on Rescission (2d ed.), § 595, and cases cited in note.) It has been said that citation of authorities is unnecessary in support of the doctrine well established in this state that an affirmance of the contract at a time subsequent to the discovery of the falsity of the representations inducing its execution forecloses the exercise of the right of rescission. (*Hunt* v. *L. M. Field, Inc.,* 202 Cal. 701, 704 [262 P. 730].) In *Bancroft* v. *Woodward,* 183 Cal. 99 [190 P. 445], it appeared that the party suing to enforce rescission of a lease collected rents thereunder after he was fully aware of his rights and was affirmatively seeking rescission. It was held that his action was unequivocal affirmance of the lease and destroyed whatever right of rescission he might theretofore have had.

█ But, say the plaintiffs, a notice of rescission was promptly given after knowledge of the facts, and the acceptance of further royalties under the lease was expressly ''without prejudice.'' It may be assumed that the plaintiffs complied with the requirements of promptness in giving notice of rescission. But by the terms of said section 1691 prompt notice does not complete the act of rescission. Restoration or offer to restore is also required. The plaintiffs neither restored nor offered to restore the benefits received under the lease. Instead they accepted further benefits, and now claim that their acceptance thereof ''without prejudice'' entitles them to retain both the previously and the subsequently received royalties as ''damages'' accruing to them pursuant to their demand for restoration of property received by the lessees. By the acceptance of royalty payments subsequent to the notice of rescission, the plaintiffs treated the lease as in existence and thereby waived their attempted rescission. Even if it be assumed that an offer to restore prior receipts

of royalties was excusable, the subsequent acceptance "without prejudice" to their rights, in the absence of assent by the defendants, does not excuse their conduct as a waiver and permit them to claim retention of the royalties as payment on account of restoration of their alleged losses in an action to enforce rescission. The rule is stated in *Brennan* v. *National Equitable Inv. Co.*, 247 N.Y. 486 [160 N.E. 924], an action to enforce rescission of a stock purchase, where the court said: "The rule is thoroughly established that an assertion of a rescission is nullified by the subsequent acceptance of benefits growing out of a contract claimed to have been rescinded. . . . When, with knowledge of the facts, the purchaser accepts dividends, he will be held to have waived the fraud and to have ratified his purchase. (Black on Rescission (1st ed.), § 347.) He cannot by words cancel his contract and then continue to assert rights and benefits under it. . . . Declarations of rescission followed by acts which negative them must be regarded in such a light as to require the inference of an abandonment of the declared act. Generally the issue is one of fact, whether the commission of certain acts shows an intent to waive a rescission. . . . Waiver is rarely established as a matter of law, but an intent contrary to apparent acts must be disclosed. . . . When moneys are paid as dividends, a shareholder is not at liberty to avoid the effect of his acceptance by a notice not assented to by the company that he will take them as something else. His retention of the dividends paid to him subsequent to his discovery of the alleged fraud and subsequent to the institution of his action on rescission must be held, as matter of law, to constitute an abandonment of rescission and a reaffirmation of the contract."

So, too, in the present case, the alleged provisional acceptance of royalties subsequent to notice of rescission, inferring retention thereof as "something else," does not harmonize the plaintiffs' inconsistent conduct. On the contrary it compels the conclusion that the plaintiffs subsequently treated the lease as in existence and that their conduct amounted to a waiver of the rescission as matter of law. The cases relied on by the plaintiffs, such as *Boerum* v. *Schenck*, 41 N.Y. 182, may be said to support a contention that provisional acceptance of the royalties would not foreclose a contest of the correctness of the amounts received, but they do not go so far

as to hold that the plaintiffs may rescind and then accept benefits under the contract without waiving their rescission and becoming bound by its obligations. (Civ. Code, §§1589, 3521.)

 Nor are we persuaded that the trial court erred in concluding that the plaintiffs were guilty of laches in seeking to invalidate the lease and to claim conversion by the defendants of all ores taken therefrom. The complaint alleges ownership of the mines by the plaintiffs and their predecessors since 1896. The fact that there were tailings on the property indicated that the mines had at one time been operated. For how long they had remained idle does not appear, but it is apparent that the Wrights in California did not know who were the co-owners of the mines. It is also inferable from the facts alleged that experienced operators were necessary in order to place the mines on a paying basis. A fair inference from the history of the operations under the lease is that it required about three years after resumption of activities before the mines produced profits to any extent. Therefore it can hardly be said that the plaintiffs were not guilty of such laches as would foreclose equitable relief when, after giving notice of rescission, they accepted the increased benefits under the lease and delayed bringing their action for nearly two years and until the lease contract had been fully performed. There is no allegation or contention that the delay resulted from an attempt to negotiate a settlement of the controversy. (See *Potter* v. *Contra Costa Realty Co.*, 220 Cal. 31, 34 [29 P.2d 189].)

 The defense of laches may be raised by demurrer where the facts constituting laches are apparent on the face of the complaint. (*Garrity* v. *Miller*, 204 Cal. 454, 455 [268 P. 622], and cases cited.) Laches does not rest entirely upon lapse of time. Unlike the statute of limitations it does not require any specified period of delay. (*Verdugo Canyon Water Co.* v. *Verdugo*, 152 Cal. 655, 674 [93 P. 1021].)

 Courts of equity will refuse relief even where the statutory time of limitation has not run, if in addition to mere passive neglect there is a showing of facts amounting to acquiescence in the acts complained of, or other circumstances which, coupled with the delay, render the granting of relief inequitable. (*Stevenson* v. *Boyd*, 153 Cal. 630, 636 [96 P. 284, 19 L.R.A.N.S. 525].) Mining lands, because of their

known tendency to sudden and violent fluctuations in value, are a class of property as to which the doctrine of laches is strictly enforced. (*Patterson* v. *Hewitt,* 195 U.S. 309, 321 [25 S.Ct. 35, 49 L.Ed. 214].) The correctness of the trial court's conclusion that the plaintiffs were guilty of laches is not affected by the denial of permission to the plaintiffs to file an amendment to the complaint to the effect that two prior actions had been begun and were dismissed without prejudice before the present action was commenced. Assuming that the commencement of a prior action might have a bearing upon the question of laches, it nevertheless appeared that no such action was commenced until more than a year after the notice of rescission and after the plaintiffs had accepted over $26,000 in additional royalties under the lease.

The foregoing sufficiently indicates the correctness of the trial court's conclusions that the plaintiffs could not state a cause for rescission of the lease, as well as the propriety of its rulings on the demurrers, without the necessity of considering other questions presented in connection with the second cause of action.

### Fifth Cause of Action

The plaintiffs seek to have the defendants declared constructive trustees of the mining claims located by the defendants Holmes and Nicholson in the adjoining territory. The plaintiffs reallege in the main the facts stated in the second cause of action, and the following in substance appears:

That the defendants agreed among themselves that they would explore and ascertain the nature and mineral bearing qualities of the territory surrounding the patented mines by means of the access gained through the underground workings in those mines; that Holmes and Nicholson appointed Fitzgerrell as their agent to negotiate for a lease in order to afford them the opportunity to make the necessary explorations, but directed Fitzgerrell not to reveal their identity in the transaction; that the defendants, through Fitzgerrell as their agent, promised the plaintiff Neet that Fitzgerrell would locate or cause to be located or acquired such of the surrounding territory as might be open to location or procurement for the benefit of the owners of the patented mines to the end that the patented mines could be worked advantageously; that by such representations and the subsequent false representation that it was impossible to locate any further claims in the surround-

ing territory, the defendants prevented the plaintiffs from making the locations; that through the access gained by the defendants to the patented mines they acquired knowledge of the fact that it would be in accordance with good mining practice, as well as profitable and advantageous, to mine the surrounding territory in conjunction with the patented mines; that the owners of the mines possessed the apex rights with respect to the surrounding territory; that notwithstanding their promise made through Fitzgerrell, the defendants made the locations for their own benefit and refused to surrender them to the plaintiffs; and that the acquisition of the claims in the public domain contiguous to the patented mines was and is necessary to the proper development and operation of the mining property owned by the plaintiffs. It is also alleged that large quantities of valuable ores have been taken from the adjoining claims and have been converted by the defendants to their own use. The plaintiffs seek a declaration that the defendants hold the mining claims for the benefit of the plaintiffs, a direction that the defendants execute conveyances thereof to the plaintiffs, an accounting of the ores removed therefrom, and a recovery based on such accounting.

The question then is whether the trial court properly sustained demurrers to the fifth cause of action on the grounds that the facts alleged were not sufficient to entitle the plaintiffs to relief, and that the action was barred by statutory time limitation as to all claims except those located within three years preceding the commencement of the action.

If the plaintiffs are to succeed in maintaining a cause of action on the theory that the defendants became trustees of the mining claims, the facts alleged must support a conclusion that there was a duty owed by them to the owners of the patented mines to take and hold the surrounding mining claims for their benefit.

It is alleged that during the negotiations concerning the transfer of the mining interests to the Rayfitz Company, the defendant Holmes was appointed to administer the estate of Mary E. Greathouse in the State of California. The plaintiffs contend that as such administrator the duty devolved upon him to locate the claims for the benefit of the estate. This position of the plaintiffs may not be sustained. The duties of the administrator in respect to the assets of the estate are defined in section 571 of the Probate Code, and include

taking possession of all property belonging to the estate and collecting debts due to the estate. The only property belonging to the estate was the 55/100ths interest in the patented mines distributable to the plaintiffs. Holmes did not operate the mines in his capacity as administrator. He was acting as lessee in his individual capacity. The plaintiffs consented to his participation in the lease and in the operation of the mines as lessee in his individual capacity, and they may not contend that his capacity as lessee, without more, was inconsistent with his trust as administrator. No duty devolved upon him as administrator to acquire the adjoining property for the estate, even though some benefit might thereby accrue to the estate. Nor may the plaintiffs successfully claim that any independent proprietary right acquired by Holmes in his individual capacity merely by reason of information gained while he was lessee, must inure to the benefit of the estate. Having consented to his operation of the estate property as lessee, they may not take the inconsistent position that he was acting as the administrator of the estate. Consequently, the question of Holmes' obligations in respect to the outlying territory must be resolved by the consideration of his status as lessee of the mines and as an alleged promisor to locate mining claims for the benefit of the owners. His obligations in that respect therefore are no different from that of his colessee.

The facts alleged cannot be said to constitute the plaintiffs and the defendants joint venturers or copartners, such as in *Holstrom* v. *Mullen*, 84 Cal.App. 1 [257 P. 545], *Koyer* v. *Willmon*, 150 Cal. 785 [90 P. 135], or *Moritz* v. *Lavelle*, 77 Cal. 10 [18 P. 803, 11 Am.St.Rep. 229]. The relationship here between the owners of the patented mines on the one hand and Holmes and Nicholson on the other was that of lessors and lessees. In that respect they were dealing at arm's length and their interests were adverse. The defendant Fitzgerrell's interest was that of co-owner with the plaintiffs. It is not alleged that he had any interest as a lessee, or that he personally gained anything of benefit from the lease, the patented mines, or the mining claims which he in turn should be deemed obligated to transfer to the owners of the mines. The lessees were Holmes and Nicholson and the claims were located by them or their agents. No duty was cast upon the lessees, as such and without more, to hold the claims for the benefit of the owners of the mines. If the facts alleged form

any basis for determining that Holmes and Nicholson, who it may be assumed now hold the mining claims, are trustees for the benefit of the owners of the adjoining patented mines, it must be on the theory that they voluntarily solicited and accepted a trust by a promise made through the defendant Fitzgerrell as their agent that such claims would be located for the benefit of the mines and the owners thereof.

In the Restatement of the Law of Restitution, section 194, subsection (2), it is said: ''A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other.'' Under Comment *d* it is observed that the rule applies even though there was no preexisting fiduciary relationship between the parties, as where one person gratuitously and orally undertakes to purchase land on behalf of another, in which case he is under no liability if he fails to acquire the property, since there is no consideration for his undertaking and no other circumstance imposing a duty upon him to acquire the property; but if he does acquire the property, and in violation of his undertaking keeps it for himself, he holds it upon a constructive trust for the person for whom he undertook to acquire it.

The courts of this state have not applied the rule in cases involving real property where no preexisting fiduciary relationship has been established, because of the intervention of the statute of frauds, or, no purchase money having been furnished by the plaintiff, because of the unauthorized extension of the doctrine of resulting trust. (See *Hardenbergh* v. *Bacon,* 33 Cal. 356, 377; *Roberts* v. *Ware,* 40 Cal. 634; *Taylor* v. *Kelly,* 103 Cal. 178, 184 [37 P. 216]; *cf. Stromerson* v. *Averill,* 22 Cal.2d 808 [141 P.2d 732].) Where the statute of frauds did not constitute a bar the courts have given effect to the promise. (*Seymour* v. *Salsberry,* 177 Cal. 755 [171 P. 938].) Thus the doctrine has been applied in cases of mining rights, which are not deemed to be real property. (See *Gore* v. *McBrayer,* 18 Cal. 582, 583, 589; *Settembre* v. *Putnam,* 30 Cal. 490; *Hardenbergh* v. *Bacon, supra; Stewart* v. *Douglass,* 148 Cal. 511 [83 P. 699].)

█ True, the defendants Holmes and Nicholson did not make the promise direct to the plaintiff Neet that they would locate or cause to be located the claims for the benefit of the

owners. But there are facts alleged, which, if proved, constitute a sufficient voluntary undertaking by those defendants to locate the claims and to hold them for the benefit of the mines and the owners thereof. Those facts are that the defendants Holmes and Nicholson required possession of the patented mines in order to gain access to the surrounding territory and thereby ascertain its value and advantage to the operation of the patented mines; that one of the inducements offered by Holmes and Nicholson through Fitzgerrell for the execution of the lease was the promise that Fitzgerrell would cause such locations to be made; that Holmes and Nicholson authorized that promise although at that time they directed that their identity be kept secret; that upon entry upon and examination of the premises leased to them, they discovered the value of the surrounding territory and its advantage to the operation of the mines; that, in violation of their promise, they and their agents made locations in their own names and operated them for their own exclusive benefit.

The facts alleged are similar to those involved in the case of *Stewart* v. *Douglass, supra.* In that case the plaintiff gave access to a prospective mining claim to the defendant, who promised to take it in their joint names and operate it for their joint benefit, but violated that promise by taking and operating the claim in his own right and for his own benefit. Although nothing more was furnished by the plaintiff, it was held that a constructive trust was established by the breach of the defendant's oral promise. In *Hardenbergh* v. *Bacon, supra,* the defendant undertook to protect the plaintiff's interest in certain mining property. However, he acquired the property in his own name and claimed it for himself. It was held that a voluntary agency relationship was established. The court said: "Such agency, as we have remarked, may be both created and proved by parol, and when the agent — it being satisfactorily shown that he is such agent — in violation of the confidence reposed in him, and of his duty, purchases for his own use an outstanding or adverse title to the property, the principal does not proceed against him as his agent to purchase the property, but on the ground that he occupied such a position of trust and confidence in reference to his principal, that his purchase was fraudulent as against the principal, and therefore may be avoided, or he may at his

election treat the agent as his trustee and claim the benefit of the purchase.''

In the case of *Seymour* v. *Salsberry, supra,* there was no formal consent on the part of the defendant to establish the agency whereby it was considered that he acted pursuant to the confidence placed in him by his principal with the resultant liability, but the court held that the consent was implicit in the facts in evidence. Likewise the facts alleged in the present case are sufficient to show that the lessees undertook to locate and operate claims in the adjoining territory for the benefit of the owners of the patented mines and to facilitate their operation, as a consequence of which they would hold the claims for the benefit of the owners and themselves during the existence of the lease, and for the owners upon its expiration. Viewed with the other facts alleged, the promise made through Fitzgerrell, if proved to have been authorized by them, should be considered as binding on the lessees as though directly made. That promise and the alleged breach thereof were sufficient to constitute the lessees and their agents, trustees of the mining claims for the benefit of the owners of the patented mines.

It does not follow, however, that the plaintiffs would be entitled to recover as damages for the conversion of any ores mined therefrom by the defendant lessees, the value of all ores mined from the claims. The defendants are entitled to be reimbursed for their expenses and labor. (*Koyer* v. *Willmon, supra; Patterson* v. *Hewitt, supra.*) Insofar as operations during the continuance of the lease are concerned, the plaintiffs' recovery would be controlled by its terms.

The plaintiffs also assert that the trial court erroneously determined that section 338, subdivision 4, specifying a three year period of limitation for the commencement of an action for relief on the ground of fraud or mistake, was the applicable statute. They contend that the court should have applied a five year period pursuant to section 318 of the same code. However, the plaintiffs cannot comply with the requirements of said section 318 to the effect that they or their ancestors or grantors must show they have been seised or possessed of the property within five years of the commencement of the action. The plaintiffs must depend upon the facts tending to establish a constructive trust, and not upon any

prior seisin or possession. The action is not one to quiet title to real property. The gravamen of the action is to establish the defendants as constructive trustees of the claims for the benefit of the plaintiffs. If there is any applicable statute of limitations, it is section 338 (4) of the Code of Civil Procedure.

The plaintiffs also contend that the trial court erred in concluding that the statute was a bar to relief as to the outlying claims located by the defendants prior to three years preceding the commencement of the action. They invoke the provisions of said section 338 (4) to the effect that a cause of action for relief on the ground of fraud is not to be deemed to have accrued until the discovery by the plaintiffs of the facts constituting the fraud. Those provisions apply as well in cases involving constructive fraud (*Boyd* v. *Blankman,* 29 Cal. 19 [87 Am.Dec. 146]), and the period of limitation is therefore three years from the discovery of the fraud. (*Estudillo* v. *Security Loan etc. Co.,* 149 Cal. 556 [87 P. 19].) The plaintiffs allege facts which, if true, indicate that their discovery of the fraud of the defendants was not made until within three years of the commencement of the action. The facts alleged do not require a conclusion that the plaintiffs were placed on notice at any earlier date.

It is alleged that the notices of locations were recorded, in compliance with section 2313 Public Resources Code (including former section 1426b of the Civil Code). It is contended that recordation served as constructive notice to the plaintiffs of the location of the claims by the defendants. One of the purposes of the recording statute is to facilitate the modes of proof of the contents of the notices (Pub. Res. Code, §§ 2322, 2323, based on former §§ 1426p and 1426q, Civ. Code). It has been said, however, that the purpose of recording notices of mining locations is to give notice of the appropriation to others seeking to locate upon the same lands, and to show a compliance with mining laws and customs. (18 R.C.L. p. 1141.) In *Bender* v. *Lamb,* 133 Cal.App. 348 [24 P.2d 208], it was held that the record was constructive notice to a subsequent claimant. The plaintiffs here, however, are not alleged subsequent claimants within the meaning of the statute. Confidence to locate the claims on a promise to hold for the plaintiffs was reposed by them in the defendants. The recording statute was not designed as a protection to the

defendants against the plaintiffs' demand for fulfillment of the promise. The mere fact of recordation was not notice that the defendants claimed adversely to the plaintiffs.

█ Nor may Fitzgerrell's alleged subsequent attempted retractions of the promise be said, without more, to start the running of the statute of limitations. It is alleged that Fitzgerrell represented that the promise was impossible of fulfillment, that locations could not be made because all the surrounding territory had already been claimed by persons unknown. The representations were not repudiations of the trust. The trust to hold the property when acquired for the plaintiffs was not created until the promise was fulfilled. A repudiation could not take place, therefore, until the property was acquired. Nor may it be said that the representations amounted to a retraction of the promise. There was no retraction or repudiation of the promise that, if the properties were in fact acquired, they would be held for the benefit of the owners of the mines. The properties having been acquired, the trust thereupon followed. █ Insofar as the facts alleged are concerned, repudiation of the trust did not occur until 1938 when, upon discovery of the fraud, the plaintiffs demanded conveyance of the trust property. The action was brought in 1940. Discovery and repudiation both, therefore, are alleged to have taken place within three years of the commencement of the action.

Facts in excuse of a more diligent inquiry and sooner discovery are also alleged. Whether the plaintiffs could have made discovery sooner is not, in view of all the facts alleged, a question to be concluded as a matter of law. It is a question to be resolved by the trial court in appraising the weight and the credibility to be accorded to the evidence and the witnesses on a trial. Assuming the truth of the facts stated in the complaint, we must conclude that the allegations show that the action was commenced within the time prescribed by said section 338 as to all of the claims.

The demurrers to the second cause of action were properly sustained and the judgment thereon is affirmed. That portion of the judgment entered on the order sustaining demurrers to the fifth cause of action is reversed.

Gibson, C. J., Curtis, J., Carter, J., and Traynor, J., concurred.

EDMONDS, J.—I concur in the conclusion that, for the reasons stated by Mrs. Justice Shenk, the demurrer to the second cause of action in the complaint of Neet and his associates was properly sustained. However, in my opinion, upon the facts pleaded by the appellants, the statute of limitations has barred any recovery by them, and the decision should also be placed upon that ground. More than three years before the suit was filed, according to the allegations of the complaint, the appellants knew that at least some of the representations assertedly made by Fitzgerrell on behalf of himself, Holmes and Nicholson were false. Under well settled principles the statute commenced to run at that time and it effectively bars the fifth cause of action as well as that stated in the second count of the complaint.

The pleading upon which judgment was rendered is the fourth one filed in this suit and the facts stated in each of them may be considered in determining whether the bar of the statute extends to either the second or the fifth cause of action. (*Wennerholm* v. *Stanford Univ. Sch. of Med.*, 20 Cal.2d 713, 716 [128 P.2d 522, 141 A.L.R. 1358]; *Williamson* v. *Joyce*, 137 Cal. 151, 153 [69 P. 980].) According to these complaints during Fitzgerrell's visit to Kentucky in 1935, and in correspondence of about the same time, he represented that the mining claims in which Neet, Schenck and Glenn together owned a 55 per cent interest were of no particular value but mere desert waste claims and a gamble in which no operators were interested. But for the purpose of facilitating possible future action, said Fitzgerrell, title to the claims should be transferred to a corporation in exchange for shares of capital stock to be issued in proportion to the respective interests of all concerned.

Less than a month later, Rayfitz Company was organized, and at the first meeting of stockholders, Neet became one of the directors. Soon after, upon the representations of Fitzgerrell that Holmes and Nicholson desired to lease the claims for a period of five years upon terms which were fair in every respect, Neet and his associates expressly authorized the corporation to execute the proposed agreement.

At the time of his visit to Kentucky, Fitzgerrell represented that he would cause to be located, for the benefit of all of the owners of the property in which Neet and his associates were interested, claims upon adjoining land. But immediately

after the execution of the lease, Fitzgerrell informed Neet by letter that this would be impossible. The complaint does not state the reason, if any, given by Fitzgerrell for his conclusion or that Neet made any inquiry as to the basis for it.

About two years later, Fitzgerrell again visited Kentucky. The second trip was made for the purpose of obtaining Neet's consent to the execution of a lease of the mining claims by the corporation to Holmes and Nicholson for a term of 20 years. In his discussions with Neet, Fitzgerrell told him that locations on land surrounding the mining claims transferred to the corporation could not be made because the property had been taken up by unknown persons.

Neet refused to consent to another lease. Fitzgerrell then went to Massachusetts, where he saw the appellant Schenck, and obtained his written consent to the execution of the 20 year agreement. Schenck's approval was secured upon the representation that Neet would also consent to the new contract. Fitzgerrell then returned to Kentucky and showed Schenck's consent to Neet, renewing his request that Neet join in approving the proposed transaction. When Neet again refused, Fitzgerrell informed him that his consent was unnecessary and the lease would be executed because, with Schenck's consent, he controlled a majority interest in the corporation. Fitzgerrell then left for California. Neet communicated with Schenck, stating that he had refused to consent to the execution of the proposed lease and Schenck, by telegram dated August 7, 1937, addressed to Fitzgerrell, withdrew his approval of the transaction. Three days later, Fitzgerrell asked Schenck to state his reasons for withdrawing his consent and told him that all negotiations concerning a new lease had been terminated. Apparently Schenck did not reply to this request.

To summarize the allegations made by the appellants, in 1935 Fitzgerrell falsely represented to Neet that the mining claims in which they were jointly interested were of little value. Two years later, and after the appellants had transferred their interests to Rayfitz Company and approved a lease of the properties to Holmes and Nicholson, Fitzgerrell endeavored to obtain the appellants' consent to another lease to the same persons for 20 years and as long thereafter as mining operations were profitably carried on. During those negotiations, Fitzgerrell made representations to Schenck which were untrue. On or before August 7, 1937, Schenck

learned that Fitzgerrell had deceived him and he withdrew the authorization which Fitzgerrell had obtained from him. Unquestionably Schenck gave Neet full information concerning the reasons for his telegram to Fitzgerrell. In any event, from an investigation made in January and February, 1938, the appellants found that all of the representations made by Fitzgerrell were false. As a result of these disclosures Fitzgerrell was ousted from control of the corporation.

A complaint upon which relief is sought because of asserted fraudulent representations made more than three years before suit was commenced must affirmatively show that the falsity of the defendant's statements was not discovered during that time. The cause of action "is not to be deemed to have accrued until the discovery, by the aggrieved party, of facts constituting the fraud or mistake" (Code Civ. Proc., § 338 (4)), but the word discovery is not synonymous with knowledge, and it is the duty of the court to determine, as a matter of law, when, according to the allegations made by the plaintiff, there was a discovery within the legal sense of that term. It has therefore been held that it is not sufficient to plead a lack of knowledge within the statutory period limiting the action. The plaintiff must allege when and how the facts concerning the fraud became known to him and also that, prior to three years before the commencement of the action, he had no means of knowledge or notice which, followed by inquiry, would have disclosed the falsity of the defendant's statements. (*Jackson* v. *Master Holding Corp.*, 16 Cal.2d 824 [108 P.2d 673]; *Bainbridge* v. *Stoner*, 16 Cal.2d 423 [106 P.2d 423]; *Kelly* v. *Longan*, 5 Cal.2d 274 [53 P.2d 971]; *Johnson* v. *Ehrgott*, 1 Cal.2d 136 [34 P.2d 144]; *Consolidated R. & P. Co.* v. *Scarborough*, 216 Cal. 698 [16 P.2d 268]; *Original Min. & Mill. Co.* v. *Casad*, 210 Cal. 71 [290 P. 456]; *Victor Oil Co.* v. *Drum*, 184 Cal. 226 [193 P. 243]; *Nichols* v. *Moore*, 181 Cal. 131 [183 P. 531]; *Galusha* v. *Fraser*, 178 Cal. 653 [174 P. 311]; *Lady Washington C. Co.* v. *Wood*, 113 Cal. 482 [45 P. 809]; *Watson* v. *Santa Carmelita etc. Co.*, 58 Cal.App.2d 709 [137 P.2d 757]; *Turner* v. *Liner*, 31 Cal.App.2d 196 [87 P.2d 740]; *Nighbert* v. *First Nat. Bank of Bakersfield*, 26 Cal. App.2d 624 [79 P.2d 1105]; *Haley* v. *Santa Fe Land Imp. Co.*, 5 Cal.App.2d 415 [42 P.2d 1078].)

For the purpose of fixing the time from which the statute of limitations commenced to run against their causes of ac-

tion, the appellants have pleaded the latter part of 1938 as the time when they "first realized that a fraud had been practiced upon them." Their conclusion in this regard is more fully explained by the allegation that because they "were widely separated and had to communicate with each other in writing and were compelled to consult lawyers, and the import and legal effect of the facts discovered on and subsequent to February, 1938, did not unfold itself to them until on or about November, 1938." But the determinative time is not the date when the appellants obtained from the corporate and public records evidence that the representations made by Fitzgerrell were untrue, for one must commence an action upon the ground of fraud within three years from the time he has that knowledge which, followed by inquiry, would disclose the falsity of the representations made to him. At least by August 7, 1937, the appellants had information which placed upon them the duty to make diligent inquiry concerning their rights. For as this court said in *Ruhl* v. *Mott*, 120 Cal. 668 [53 P. 304], when a person "discovers that he has been put upon and defrauded as to one material matter, notice is at once brought home to him that the man who has been false in one thing may have been false to him in all, and it becomes incumbent upon him to make a full investigation." (*Carpenter* v. *Hamilton*, 18 Cal.App.2d 69 [62 P.2d 1397]; *Nicolaisen* v. *Toffelmier*, 97 Cal.App. 342 [275 P. 823]; *Gratz* v. *Schuler*, 25 Cal.App. 117 [142 P. 899].)

Unquestionably, it was the information obtained in July, 1937, which prompted the investigation of the transactions entered into upon Fitzgerrell's representations, and as a matter of law, the statute of limitations ran upon the appellants' causes of action at that time. Suit was not commenced until August 28, 1940, although it affirmatively appears from the complaints that all of the details concerning the value of the mining claims owned by the corporation and of Fitzgerrell's deception in regard to the adjoining land were known before the end of 1938. Under these circumstances, in my opinion, the demurrer to each of the causes of action was properly sustained and the judgment should be affirmed.

Schauer, J., concurred.

Appellants' petition for a rehearing was denied January 18, 1945.