**ALABAMA VERMICULITE CORPORA-TION, a corporation, Plaintiff,**

v.

**J. T. PATTERSON, W. A. Patterson, and T. M. Patterson, Defendants.**

**Civ. A. No. 1313.**

United States District Court
W. D. South Carolina,
Greenville Division.

April 22, 1954.

442

Wyche, Burgess & Wyche, Greenville, S. C., for plaintiff.

Blackwell, Sullivan & Wilson, Laurens, S. C., Thomas A. Wofford, Greenville, S. C., for defendants.

WILLIAMS, District Judge.

This action was instituted in the District Court of the United States for the Western District of South Carolina on September 4, 1952, by Alabama Vermiculite Corporation, against J. T. Patterson, W. A. Patterson and T. W. Patterson, for a declaratory judgment, new 28 U.S.C.A. §§ 2201, 2202, adjudicating the rights and liabilities of the parties under a certain lease for the mining of vermiculite ore, and specific performance on the part of the defendants of said lease.

Defendants contend that the lease agreement is not in effect because of a breach thereof in four particulars. They are

1. That the lease agreement had been assigned contrary to its terms.

2. That plaintiff fraudulently dumped merchantable vermiculite in the creek at Sylva, North Carolina, to reduce the yield below forty (40) bags per ton and thus avoid paying a premium price for the ore.

3. That plaintiff requested shipment of ore in box cars while the lease agreement contemplated that shipment should be in open cars.

4. Deductions were wrongfully made from the contract price of the ore.

The case came on for trial before the Court, without a jury, on November 9 and 10, 1953, at which time oral and documentary evidence was introduced from which the Court makes the following findings of fact and conclusions of law:

Findings of Fact

1. That plaintiff is a corporation organized, created and existing under the laws of the State of Alabama, but domesticated in South Carolina.

2. That defendants are citizens and residents of Laurens County, South Carolina, in the Western District of this Court.

3. That the amount in controversy in this case exceeds the sum of Three Thousand ($3,000) Dollars.

4. That the Court has jurisdiction of the subject matter of this action and has obtained personal jurisdiction of all the parties thereto.

5. That on November 17, 1950, the defendants acquired title to a tract of land containing 270 acres, more or less, in Laurens County, South Carolina, more

fully described in the lease agreement hereinabove referred to, and that a valuable deposit of vermiculite ore is located on said tract.

6. That on May 22, 1951, defendants, as lessors, entered into a lease agreement with one R. M. Biddle, as lessee, for the mining of said ore for a period of five (5) years from date with an option to renew for an additional five-year period upon ninety (90) days notice by registered mail. The lessee agreed to pay seventy-five cents per ton for each ton of unprocessed vermiculite removed from the premises. The lessee appointed the defendants (lessors) as agents to mine said ore and "to load the same on cars at Lanford Station, South Carolina" and agreed to pay for the ore and their services in mining and loading the same Four and 75/100 ($4.75) Dollars per ton, delivered to the railroad at Lanford Station, South Carolina, i. e. Seventy-five cents (75¢) per ton for ore and $4 per ton for mining; the lease agreement further provided that should the ore exceed an allowance of 10% for moisture and 10% for waste material, Lessee could reduce the price paid in proportion to the amount of moisture and waste in excess of 20%, and that should the yield of merchantable vermiculite exceed 40 bags per ton the lessee would pay a premium in proportion to the increase.

The defendants as lessors agreed to mine the ore in such quantity as called for by lessee not to exceed six (6) carloads per week except that when lessee desired to ship to more than two processing plants, he could call for increased deliveries.

The lease further provided that should the lessors fail and refuse for any reason to mine the ore, the lessee should be permitted to mine for his own account and should have such rights together with the right-of-way for ingress and egress and the right to construct necessary mining equipment, with exclusive right to possession of the premises during the mining by lessee. Lessee agreed in such event to pay Seventy-five cents (75¢) per ton for all ore mined by him.

The seventh paragraph of the lease reads as follows:

"7th. It is understood and agreed that this lease agreement may not be assigned by the Lessee except upon the written consent of Lessor. Consent that his agreement be assigned to Alabama Vermiculite Company is however hereby given."

7. That the lease was validly entered into by the parties on May 22, 1951; that each party was represented by counsel during the negotiations leading up to the execution of said lease and each attorney participated in the preparation of the lease agreement.

8. That within a few days after its execution, the lease, in accordance with its terms, as set forth in paragraph 7 thereof, was validly assigned by Biddle, the lessee, to the plaintiff, Alabama Vermiculite Corporation. That there has been no further assignment of the contract itself.

9. The first shipment of ore under the lease was made in June of 1951 and shipments continued until December, 1951, nine (9) cars in all being shipped. All the ore was shipped in closed box cars, and paid for in full by plaintiff corporation.

10. On January 21, 1952, R. W. Sterrett and H. K. Sterrett purchased 1900 of the outstanding 2000 shares of stock of Alabama Vermiculite Corporation. In September of 1952 they purchased the remaining 100 shares. At the time of this purchase there were no outstanding, unfilled orders for the mining of vermiculite ore under the lease agreement.

11. The first two cars of ore were paid for at the contract price of Four and 75/100 ($4.75) Dollars per ton on railroad weights. When the third car was paid for by plaintiff a total deduction of One Hundred Forty-five and 96/100 ($145.96) Dollars was made, which represented a claimed deduction for excess of 10% moisture and 10% waste resulting in a yield of less than 40 bags per ton, on the first three (3) cars.

The defendants protested this deduction and while the dispute was being settled defendants shipped three additional cars of ore. Finally, on the payment for the seventh car which was made in December of 1951, the plaintiff paid the defendants the One Hundred Forty-five and 96/100 ($145.96) Dollars previously deducted on payments for the first three cars, and explained that after rechecking, plaintiff found that the ore yielded approximately 40 bags per ton. Thereafter, two additional cars were shipped by defendants to plaintiff on November 30, 1951 and paid for in December of 1951, and two cars were shipped and paid for in December of 1951, both at Four and 75/100 ($4.75) Dollars per ton on railroad weights.

12. Shortly after performance of the contract was begun a disagreement arose between the parties on two points, (1) whether or not the ore was to be shipped in open hopper cars or closed box cars and (2) whether or not plaintiff, the lessee, had the right to deduct for adjustment of waste and moisture from the full $4.75 per ton or only from the 75¢ per ton which was the price of the ore itself.

On the first point the lease contract provided for shipment in "cars." The lease did not state whether shipment was to be made in open cars or closed cars. The reason plaintiff requested closed cars was the lack of an established freight rate for carrying this commodity in open hopper cars from Lanford Station, South Carolina, where the mine was located, to Sylva, North Carolina, where the parties contemplated plaintiff's processing a part of the ore at the time the lease was entered into. It was to the mutual advantage of both parties to use open cars inasmuch as loading and unloading was thereby facilitated. Plaintiff agreed to accept open cars as soon as the rate was established, and shortly after the question arose requested of the Interstate Commerce Commission the immediate establishment of such rate. The rate for open cars became effective March 5, 1952. Defendants failed and refused to make any deliveries on orders made by plaintiff after the Sterretts bought controlling interest, in spite of the fact that some of them were placed before the rate became effective specifying open cars and some after said date.

As heretofore stated, all nine cars shipped by defendants under the contract were in closed box cars. On November 30, 1951, defendants notified plaintiff of the release of two cars, stating, "Shipping these in the boxed cars at the present time is not to be considered as waiving our rights to the other cars." Thereafter, in December of 1951, defendants released two other cars of ore in closed box cars. Defendants did not consider the contract had been broken because plaintiff had requested closed cars, a request in which defendant had acquiesced.

On the latter point it was defendants' (lessors') contention that plaintiff was obligated to pay them Four ($4) Dollars per ton for everything mined and shipped even though it was 50%, 75% or even 90% waste material. This is contrary to the express terms of the lease agreement which required defendants to mine "and load merchantable vermiculite ore." I find that plaintiff was entitled under the contract to make the adjustment on the entire cost per ton of $4.75 and not on the cost of the vermiculite ore alone (75¢ per ton). Be that as it may, the defendants have been paid and accepted compensation for all the vermiculite mined and loaded and it is clear from all the evidence that neither party considered the lease broken on this account, prior to the time R. W. Sterrett and H. K. Sterrett purchased the stock in plaintiff corporation in January of 1952.

13. On January 29, 1952, R. W. Sterrett advised defendants that he and his brother, H. K. Sterrett, had purchased the stock of plaintiff corporation. On January 30th plaintiff gave defendants an order for two cars of ore—one in box car to Sylva, North Carolina, and one in open car to the Zonolite plant in Travelers Rest, South Carolina. On January 31st plaintiff gave defendants an order

for nine cars, to be shipped in box cars to Sylva, North Carolina. At the request of defendants, this last order was, on February 13, 1952, put in letter form, specifying open cars. On March 17, 1952, an order was placed for twelve additional cars and on August 19, 1952, plaintiff requested defendants to ship twelve cars per month up to September 1, 1952, and thereafter at the rate of six carloads a week. None of these orders was filled in either open or closed cars.

As heretofore stated, there was no unfilled order prior to January of 1952, when the Sterrett brothers purchased the majority stock in plaintiff corporation. The fact that shipments of ore had been requested and made in closed cars prior to that time was not a breach of the contract. Furthermore, the fact that after the Sterretts acquired the stock the plaintiff corporation placed orders for ore in closed cars, which orders were filled by the defendants, would not constitute a breach of the contract by plaintiff.

14. Plaintiff did not dump merchantable ore in the creek at Sylva, North Carolina.

Plaintiff had a contract with Vermiculite Supplies, Inc., an independent corporation, for use of the latter's plant at Sylva, North Carolina, to process ore mined and shipped by the defendants. The price was 5¢ per bag of merchantable vermiculite. Plaintiff also had a contract with one H. A. Lawhead for the processing of ore under the terms of which he was paid fifteen (15¢) cents per bag for all the ore processed. Yields per ton were computed by H. A. Lawhead and the president of Vermiculite Supplies, Inc. They were paid on the yields so computed and these same figures were used in making reports of yields to plaintiff and plaintiff paid defendants on this same basis. It was necessary to remove the waste from the plant in the expanding operation. This is the only material that was dumped in the creek. It was not a merchantable product.

Defendants contended that merchantable vermiculite was dumped in the creek to fraudulently avoid paying a premium for a yield of more than 40 bags per ton. To prove such a fraudulent act requires clear and convincing evidence. The evidence fails to sustain the contention advanced; on the contrary the evidence proves affirmatively that such acts were not committed.

### Conclusions of Law

1. That a sale of the stock of plaintiff corporation to R. W. and H. K. Sterrett in January and September of 1952, did not amount to an assignment of the contract, in violation of the provisions of Paragraph 7, prohibiting the assignment of the lease without written consent of the lessor. Paragraph 7 consents to the assignment from Biddle, the lessee, to plaintiff corporation and a sale of plaintiff's corporate stock does not violate this restriction.

A very strong and persuasive case is Burrows Motor Co. v. Davis, D.C.Mun. App.1950, 76 A.2d 163, 164. In that case the majority of the corporate stock was sold to one Burrows who then took control of and operated the corporation. Davis claimed this a violation of the non-assignment clause in the lease to the corporation. The Court held that such a sale of the corporate stock cannot amount to an assignment, saying:

"At the time plaintiff consented to the assignment of the lease from Burrows to the defendant corporation it can not be doubted that she must have realized the consequences of her action. Corporations being artificial creatures of the law by their very nature hold certain powers not possessed by individuals. We are asked here to condemn the exercise by stockholders of the right of transfer of stock solely because its exercise achieved a result which could not have been accomplished had an individual been the plaintiff's tenant. This we can not do."

To the same effect are Ser-Bye Corporation v. C. P. & G. Markets, Inc.,

446

1947, 78 Cal.App.2d 915, 179 P.2d 342; Posner v. Air Brakes & Equipment Corp., 1948, 2 N.J.Super. 187, 62 A.2d 711; Rivoli Holding Co. v. Ulicny, 1931, 109 N.J.Eq. 54, 156 A. 369.

2. The contract was not breached by plaintiff because of deductions made in the contract price of the ore. Although deductions were made on the first three shipments, they were subsequently paid to and accepted by the defendants after which time four additional cars were shipped. It is true that defendants stated that they accepted the payment and made further shipments without waiving their rights. Since there was in fact no breach, a mere statement that no rights were being waived, would not change the legal situation. The retention of a right to declare a breach when there is no breach is without legal effect.

3. Assuming that there was a breach, the subsequent performance of the contract by defendants and their acceptance of benefits under it constituted a waiver of any rights they might have flowing from the alleged breach.

In Pickens County v. National Surety Co., 4 Cir., 1926, 13 F.2d 758, 762, the defendant contractor entered into a construction contract for Pickens County. It failed to pay him the amount due for one month's work. Nevertheless, he continued to perform the contract for two months and was paid in full for this work. The contractor then abandoned the contract and suit was brought by the County against the contractor and his surety. The surety defended on the ground that the County's failure to pay one month's instalment amounted to a breach which justified rescission on the contractor's part. The United States Court of Appeals for the Fourth Circuit, speaking through Judge Parker, held that there was ample evidence that defendant waived any right to rescind by accepting payments under the contract after knowledge of the alleged breach. The Court said:

"There can be no question, furthermore, that the receipt by the contractor of the $8,557.16 on the March estimates, the continuing of the work under the contracts, and the collection of the amounts due under the estimates of April and May, constituted evidence from which the jury might infer a waiver of the right to rescind or abandon the contracts * * *. 6 R.C.L. 990, 1022; Williston on Contracts, vol. 2, p. 1329; Miami Cycle & Mfg. Co. v. Robinson, 6 Cir., 245 F. 556; Jeffrey Mfg. Co. v. Central Coal & Iron Co., C.C., 93 F. 408."

In Pasquel v. Owen, 8 Cir., 1950, 186 F.2d 263, 270, defendant was hired as a baseball player and manager. He was dismissed as manager but continued as player for five weeks when he abandoned the contract. In the suit by the owner, defendant alleged that his removal as manager was a breach which entitled him to rescind the contract. The Court of Appeals, speaking through Judge Gardner, and citing the Pickens County Case, supra, held that the performance of the contract as player after being fired as manager was a waiver of the breach, saying:

"Here, after the alleged breach defendant not only continued under the contract but plaintiff paid the compensation due under the contract. This action showed that the contract was deemed to be a subsisting agreement after the alleged default. Nathan Elson & Co. v. H. Beselin & Son, 116 Neb. 729, 218 N.W. 753; 12 Am.Jur., title Contracts, Sec. 390. In Williston on Contracts, Sec. 688, it is said: 'The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense therefore is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to.'

"The undisputed evidence here, in our view, showed as a matter of law that the defendant waived the alleged breach of the contract by the plaintiff and hence he had no right to abandon it."

In Neet v. Holmes, 25 Cal.2d 447, 154 P.2d 854, 860, plaintiffs owned certain mineral interest which they were fraudulently induced to part with in exchange for stock in a corporation being formed for the purpose of exploiting the mines. After discovering the fraud, plaintiffs gave notice to the corporation and defendants, as lessees, that they were rescinding the conveyance and lease on grounds of fraud. Defendant lessee continued to work the mine and pay royalties to plaintiffs which they accepted, claiming it was *without prejudice to the plaintiffs' rights*. This action was brought to enforce rescission of the lease. The Court held that the acceptance of the royalties after discovery of the fraud, constituted waiver and that the acceptance of the royalty payments "without prejudice" was of no legal effect.

The Court said:

"The plaintiffs neither restored nor offered to restore the benefits received under the lease. Instead they accepted further benefits, and now claim that their acceptance thereof 'without prejudice' entitled them to retain both the previously and the subsequently received royalties as 'damages' accruing to them pursuant to their demand for restoration of property received by the lessees. By the acceptance of royalty payments subsequent to the notice of rescission, the plaintiffs treated the lease as in existence and thereby waived their attempted rescission. Even if it be assumed that an offer to restore prior receipts of royalties was excusable, the subsequent acceptance 'without prejudice' to their rights, in the absence of assent by the defendants, does not excuse their conduct as a waiver and permit them to claim retention of the royalties as payment on account of restoration of their alleged losses in an action to enforce rescission. The rule is stated in Brennan v. National Equitable Inv. Co., 247 N.Y. 486, 160 N.E. 924, 925, an action to enforce rescission of a stock purchase, where the court said: 'The rule is thoroughly established that an assertion of a rescission is nullified by the subsequent acceptance of benefits growing out of a contract claimed to have been rescinded. * * * '

"So, too, in the present case, the alleged provisional acceptance of royalties subsequent to notice of rescission, inferring retention thereof as 'something else,' does not harmonize the plaintiffs' inconsistent conduct. On the contrary it compels the conclusion that the plaintiffs subsequently treated the lease as in existence and that their conduct amounted to a waiver of the rescission as matter of law."

To the same effect as the above-cited cases are English v. National Casualty Co., 138 Ohio St. 166, 168, 34 N.E.2d 31; Morse v. Kogle, 162 Kan. 558, 178 P.2d 275; Dobie v. Sears Roebuck & Co., 164 Va. 464, 180 S.E. 289, 107 A.L.R. 1026; Cartwright v. Bartholomew, 83 Ga.App. 503, 64 S.E.2d 323, 325. See also the cases collected in 17 C.J.S., Contracts, § 443.

 4. There was no breach of the lease agreement regarding the type of cars to be furnished. The lease specified cars without mention of whether they were to be open or closed. The parties, however, performed the contract in closed cars until December, 1951. Defendants' attempted reservations of rights after knowledge of the alleged breach and after subsequent performance on their part constituted a waiver on this issue. See Pickens County v. National Surety Co., supra; Pasquel v. Owen, supra; Neet v. Holmes, supra.

 5. Plaintiff did not dump merchantable vermiculite ore in the creek at Sylva, North Carolina.

448

The contention of defendants that this was fraudulently done to avoid paying a premium price for ore which yielded more than 40 bags per ton, as is the case of all the defenses raised by defendants, is an affirmative defense. As such, the burden of proof is on the defendants. Reliance Life Insurance Co. v. Burgess, 8 Cir., 1940, 112 F.2d 234, 238, certiorari denied 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453:

"It is a fundamental rule that the burden of proof in its primary sense rests upon the party, who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action. It is generally upon the party who will be defeated if no evidence relating to the issue is given on either side. (Citing cases.)"

See also, Ford v. Atlantic Coast Line R. Co., 169 S.C. 41, 168 S.E. 143, affirmed Atlantic Coast Line R. Co. v. Ford, 1933, 287 U.S. 502, 53 S.Ct. 249, 77 L.Ed. 457.

Since the proof involves an allegation of fraud, it must be clear and convincing. In Holley Coal Co. v. Globe Indemnity Co., 4 Cir., 1950, 186 F.2d 291, 296, at page 296 the Court, speaking through Judge Dobie, said:

"Finally, the question of the sufficiency of proof has been raised. It is true that when fraud or dishonesty is an element of a civil suit, it must be shown by clear and convincing evidence. See Hardware Mut. Ins. Co. of Minnesota v. Jacob Hieb, Inc., 8 Cir., 146 F.2d 447, 452."

See also, to the same effect, The Sirius Star v. Sturgeon Bay Shipbuilding & Dry Dock Co., 7 Cir., 196 F.2d 479; Metropolitan Life Ins. Co. v. Stuckey, 194 S.C. 469, 10 S.E.2d 3.

6. That the lease agreement dated May 22, 1951, between the defendants and one R. M. Biddle, now assigned to the plaintiff corporation, is in full force and effect and binding upon the parties.

7. That said lease agreement has been breached by the defendants by their failure to ship the orders for cars on January 30, 1952, January 31, 1952, February 13, 1952, March 7, 1952 and August 9, 1952.

8. That by reason of said failure, plaintiff has the right of exclusive possession of the premises described in the lease, with the right to mine the vermiculite ore therefrom in accordance with the provisions of Paragraphs 4, 5 and 6 of the lease agreement, paying the defendants therefor 75¢ per ton for such unprocessed vermiculite ore removed.

9. That the defendants should deliver possession of said premises to plaintiff for said purpose, in accordance with the terms of Paragraphs 4, 5 and 6 of the lease agreement.

10. That this Court should retain jurisdiction of the cause for the purpose of enforcing compliance with the terms and conditions of this order.

Now, Therefore, Pursuant to the foregoing findings of fact and conclusions of law,

It Is Ordered That the defendants be and they are hereby ordered and directed to forthwith deliver to the plaintiff exclusive possession of the following described real estate for the purpose of mining vermiculite ore in accordance with the provisions of Paragraphs 4, 5 and 6 of the lease agreement, entered into by the defendants and R. M. Biddle on May 22, 1951, and assigned to plaintiff and that plaintiff pay to the defendants the price per ton for said unprocessed vermiculite ore in accordance with the terms of said lease agreement:

All that tract, piece or parcel of land, lying, being and situate in Laurens County, State of South Carolina, containing Two hundred seventy (270) acres, more or less, bounded on the North by lands of Clarence Cooper, now or formerly, and by Enoree River, on the East by lands of J. T. Patterson, and lands of Miss Bell Patterson, on the South by Buckhead Creek, lands of W. M. Owings across said creek, and on the West by lands of J. M. Patterson, J. H. Cunningham, and Clarence Cooper, now or former-

ly. Being the identical tract of land conveyed by Mrs. Alice Patterson to J. T. Patterson, W. A. Patterson, and T. M. Patterson by her deed dated the 17th of November, 1950, and recorded in Deed Book 101, at Page 213, in the office of the Clerk of Court for Laurens County. Said tract hath the following courses and distances according to plat of Claude E. Sparks, Registered land surveyor, dated the 9th of January, 1951.

Commencing at the Northernmost corner a stone, and running thence South 37 degrees 15 minutes East 7.50 chains to a stone, thence South 22 degrees 15 minutes East 8.00 chains to stone, thence South 78 degrees East 3.80 chains to willow, thence South 47 degrees 30 minutes East 5.30 chains to ash, thence North 85 degrees East 1.40 chains to Enoree River, thence down the meanders of Enoree River to mouth of branch, thence up the meanders of branch 33.75 chains to spring, thence South 62 degrees West 2.35 chains to corner, thence North 13 degrees West 5.80 chains to stone, thence South 77 degrees West 3.00 chains to stone, thence South 19 degrees 45 minutes West 6.04 chains to stone, thence North 70 degrees West 9.86 chains to stone, thence South 34 degrees West 9.50 chains to iron pin on Pooletown road, then in a Westernly direction with the road 11.80 chains R. O. 3x witness to corner, thence South 11 degrees 30 minutes West 17.00 chains to corner, thence South 10 degrees West 14.10 chains to stone, corner, thence with old hedgerow South 8 degrees 45 minutes East to corner, thence South 4 degrees 30 minutes East 7.00 chains to corner, thence South 3 degrees 15 minutes West 5.00 chains to corner, thence South 10 degrees 45 minutes East 2.55 chains to stone on Buckhead Creek, thence up the meanders of Buckhead Creek to stone 3xom, thence North 32 degrees 30 minutes East 22.65 chains to stone corner, thence North 56 degrees 30 minutes West 8.53 chains to stone corner, thence North 33 degrees 30 minutes East 12.75 chains to stone in old road, thence North 35 degrees 45 minutes East 57.10 chains to stone, the beginning corner.

It Is Further Ordered, Adjudged, and Decreed That this Court retain jurisdiction of the cause for the purpose of enforcing compliance with the terms of this order.