# THE CITIZENS BANK & TRUST COMPANY OF MARYLAND *v.* THE BARLOW CORPORATION

[No. 54, September Term, 1982.]

*Decided March 3, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Sidney G. Leech* and *Anthony Cipiti, Jr.,* with whom were *Cleaveland D. Miller* and *Semmes, Bowen & Semmes* on the brief, for appellant.

*M. Michael Cramer,* with whom were *Benjamin A. Klopman* and *M. Michael Cramer, Chartered* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

This case presents the question under a commercial lease to a corporate tenant of whether the merger of the tenant into another corporation violates a nonassignment clause which expressly includes assignments by operation of law. We shall hold that the nonassignment clause was breached.

The problem arises out of the merger of Century National Bank, a national banking association (Century), into The Citizens Bank & Trust Company of Maryland, a Maryland banking association (Citizens). Century had used as its principal office certain premises located in a building at 5454 Wisconsin Avenue, Chevy Chase. The premises were leased by Century from The Barlow Corporation (Barlow) for an initial term of 15 years beginning November 1, 1976 at a fixed rent which was subject to escalation, based on a consumer price index, in alternate years beginning with the third year of the term. Paragraph 19.01 of the lease, in relevant part, provided:

> Tenant shall not assign this Lease in whole or in part, nor sublet ... all or any part of the Premises without the prior written consent of Landlord in each instance .... This prohibition against assigning, or subletting shall be construed to include a prohibition against any assignment, or subletting by operation of law.

Stricken from the lease was a proposed paragraph 19.02 which, in part, would have provided that

> [t]he present shareholders with a controlling interest in Tenant shall not relinquish or otherwise transfer control of Tenant either through the sale, issuance, or redemption of stock therein, or otherwise without the prior written consent of

Landlord, if in the opinion of an independent Certified Public Accountant chosen by Landlord, the security for Tenant's performance of the terms of this lease is impaired or lessened by such transfer of control.

Assignment by Century, except as permitted in paragraph 19.01, was specified to be a default under the lease. During default Barlow could, at its option, give Century written notice of intent to terminate the lease in five days.

Century and Citizens entered into their agreement and articles of merger on July 17, 1980. Century undertook to use its best efforts "to obtain the consent of third parties to the assignment of all contracts to which it is a party, in every instance where such consent is required, and particularly of all leases for the banking offices of Century." Paragraph 8 of the agreement, entitled "Effect of Merger," provided:

On the effective date of the merger, the resulting bank shall be considered the same business and corporate entity as each constituent bank with all of the rights, powers and duties of each constituent bank except as limited by the charter and By-Laws of the resulting bank. All the rights, franchises and interests of each constituent bank in and to every species of property . . . shall be deemed to be transferred to and vested in such resulting bank without any deed or other transfer. The resulting bank, by virtue of the merger and without any order or other action on the part of any court or otherwise, shall hold and enjoy the same and all rights . . . including appointments, designations and nominations and all other rights and interests as trustee, executor, administrator . . . and in every other fiduciary capacity, in the same manner and to the same extent as such rights . . . were held or enjoyed by each constituent bank at the time of the merger.

On August 15, 1980 Century sent Barlow a form of consent to assignment. Century's covering letter in part stated that "[w]hen the merger is effective, our leasehold interest ... will be transferred by operation of law to Citizens ...." Barlow replied on August 20, 1980 by transmitting a revised consent which was conditioned on an increase in rent effective the first of the month following the completed merger. After the requisite federal, state, and shareholder approvals had been obtained, the merger became effective on March 13, 1981. Four days later Barlow gave notice to Century and Citizens of its intent to terminate the lease on March 23, 1981.

Thereupon Citizens brought the instant action for a judgment declaring that it had not breached the nonassignment clause. Barlow sought a counter declaration which additionally requested a determination that Citizens was liable to it for the fair market rental value of the premises from March 23, 1981. The trial court held that the merger had effected an assignment of the lease within the meaning of paragraph 19.01, that Barlow had not consented, and that the lease had terminated on March 23. The parties agreed as to the liability of Citizens to Barlow, and the trial court incorporated their stipulation in its judgment. Citizens appealed to the Court of Special Appeals, and we granted certiorari prior to consideration of the case by the intermediate appellate court.

Citizens' first contention is that there has been no assignment. We do not agree. The parties have treated this merger, in which the state bank is the surviving corporation, as governed by Md. Code (1980, 1982 Cum. Supp.), §§ 3-701 through 3-712 of the Financial Institutions Article.[1] Of principal significance is § 3-712 which provides in relevant part:

---

1. The cited sections are part of subtitle 7, part I of that article, in which the following definitions are employed:

" 'Bank' means a commercial bank or a national banking association" (§ 3-701 (b));
" 'Constituent bank' means a party to a consolidation, merger, or transfer of assets" (§ 3-701 (c)); and

(a) *General rule.* — Consummation of a consolidation or merger has the effects provided in this section.

(b) *Cessation of separate existence.* — The separate existence of each constituent bank, except the successor, ceases.

(c) *Transfer of property, rights, duties, and franchises.* — (1) The successor shall be considered the same business and corporate entity as each of the constituent banks and, except as limited by its charter or bylaws, has all of the rights, powers, and duties of each constituent bank.

(2) Each constitutent bank's rights, franchises, and interests in any property become the property of the successor without any deed, transfer, or other action.

(3) The successor has the same powers that each constitutent bank had as to any property held in any fiduciary capacity without any deed, transfer, or other action. The successor may be removed or replaced as fiduciary in the same manner and to the same extent as the constituent bank.

(d) *References to constituent bank; use of constituent's name.* — (1) Unless this construction would be unreasonable, any reference to any constituent bank in any writing, whether executed or taking effect before or after the consolidation or merger, shall be interpreted as a reference to the successor.

(2) The successor may use the name of any constituent bank if it can do any act more conveniently under that name.

---

" 'Successor' means the bank that carries on the business of the constituent banks after a consolidation, merger, or transfer of assets" (§ 3-701 (d)).

"Commercial bank" is defined in § 1-101 (f) of that article as "an institution that is incorporated under the laws of this State as a State bank or trust company."

In the instant matter, by virtue of the terms of the merger agreement and under the provisions of § 3-709, the merger became effective when the executed agreement, together with shareholders' resolutions, were filed with the Maryland Bank Commissioner on March 13, 1981. Century's separate corporate existence thereupon ceased. § 3-712 (b).[2] Century's leasehold interest in the subject premises thereby became the property of Citizens. § 3-712 (c) (2). The transfer of the property from the extinguished corporation to the surviving corporation was by force and effect of the statute. It was a transfer by operation of law. *See Dodier Realty & Investment Co. v. St. Louis National Baseball Club,* 361 Mo. 981, 238 S.W.2d 321 (1951) (transfer of assets from merged corporation to surviving corporation under general corporation law, including merged corporation's leasehold interest, was effectuated under and by force of the statute itself and was by operation of law); *Segal v. Greater Valley Terminal Corp.,* 83 N.J. Super. 120, 199 A.2d 48 (1964) (short form merger of wholly-owned subsidiary corporation into parent passed the subsidiary's leasehold interest by operation of law). *See also United States v. Seattle-First National Bank,* 321 U.S. 583, 64 S. Ct. 713, 88 L. Ed. 944 (1944) (transfer of title to real estate, stocks and bonds owned by a state bank which merged into a national bank was "wholly by operation of law" within a Treasury Regulation exemption from documentary stamp taxes for such transfers).

---

**2.** Any conceptual difficulty with having a federally chartered corporation's existence cease at the time a merger is consummated under state law is resolved by 12 U.S.C. § 214b which reads:

The franchise of a national banking association as a national banking association shall automatically terminate when its conversion into or its merger or consolidation with a State bank under a State charter is consummated and the resulting State bank shall be considered the same business and corporate entity as the national banking association, although as to rights, powers, and duties the resulting bank is a State bank. Any reference to such national banking association in any contract, will, or document shall be considered a reference to the State bank if not inconsistent with the provisions of the contract, will, or document or applicable law.

Citizens, however, contends that § 3-712 (c) (2) means that the merged bank's property interests "become the property of the successor without any ... transfer ...." This language, of course, must be read in its full context, *i.e.,* "without any deed, transfer, or other action." This simply means that the transfer is effected without any instrument of transfer being required in addition to those which effect the merger. Rather than providing that there is no transfer at all, the language provides for a transfer by operation of law. Accordingly, § 3-710 (b) states that the certificate of merger issued by the Bank Commissioner *"may* be recorded in any office where deeds are recorded to evidence the new name in which the property of the constituent banks is held." (Emphasis added.)

But, says Citizens, the language of § 3-712 (c) (1), whereby the "successor shall be considered the same business and corporate entity as each of the constituent banks," and of § 3-712 (d) (1), under which "any reference to any constituent bank in any writing ... shall be interpreted as a reference to the successor," dovetail with Citizens' reading of subsection (c) (2) and result in no transfer being effected by a merger.

The "same corporate entity" language of § 3-712 (c) (1) on which Citizens relies is derived from a provision in the National Banking Act which deals with the consolidation and merger of national banks into state banks. See former 12 U.S.C. § 34a (1958), now codified as 12 U.S.C. § 215.[3] The

---

**3.** Prior to 1950 there was no provision for the conversion, consolidation or merger of a national bank into a state bank. The then prevailing technique used, as its first step, the voluntary liquidation of the national bank. This created an exposure on the shareholders of the national bank for capital gains taxes. *See* Paton, *Conversion, Merger and Consolidation Legislation — "Two-Way Street" For National and State Banks,* 71 Banking L.J. 15 (1954). To remedy this problem Congress passed the National Bank Merger Act of 1950, Aug. 17, 1950, ch. 729, 64 Stat. 455. Section 3 of that Act is now 12 U.S.C. § 214b, which is quoted in n.2, *supra.* The Model State Bank Code Committee of the American Bankers' Association drafted proposed state legislation to implement the 1950 federal act. This model bill was introduced in Maryland. *See* Report of the Legislative Council to the General Assembly of 1951, at 8. The bill was enacted as Ch. 20 of the Acts of 1951. It contained the statement that a "resulting state bank shall be considered the same business and corporate entity as each constituent bank

provision was explained in *Fidelity-Baltimore National Bank v. United States,* 328 F.2d 953 (4th Cir. 1964), *cert. denied,* 379 U.S. 823, 85 S. Ct. 48, 13 L. Ed. 2d 34 (1964). The case arose out of the merger of Fidelity Trust Company, a Maryland bank, into Baltimore National Bank. In an effort to obtain a refund of stamp taxes, the surviving corporation argued that no transfer had taken place because the statute provided that the "consolidated" corporation was to be deemed the same corporation as each of the constituent institutions. The district court agreed, 213 F. Supp. 631 (1963), and was reversed. Judge Haynsworth, writing for the court, pointed out that the language relied upon had been added in 1933 to § 34a of the National Bank Act to remove an impediment to amalgamations of national and state banks resulting from a Supreme Court decision holding that the identity of a state bank, which merged into a national bank, was lost, so that the consolidated bank could not act as an executor under a previous appointment of the state bank.[4] The Fourth Circuit said that "[t]here is no evidence whatever that the 1933 amendment was intended to do anything other than to preserve to the consolidated corporation previously existing rights of the state bank constituents, including those rights it exercised under fiduciary appointments of state courts. . . . Congress did not intend by the 1933 amendment to provide for the kind of hermaphroditic institution which Fidelity-Baltimore contends resulted . . . ." 328 F.2d at 956. The court summed up as follows:

> The provision of § 34a for the continuation of the identity of each of the constituents can be harmo-

---

. . . ." Md. Code (1951), Art. 11, § 115 (a). Title 3, subtitle 7 of the present Financial Institutions Article is the revised form of the 1951 legislation.

Section 3 of the Bank Merger Act of 1950 was intended to be "similar in effect to the provisions of the National Bank Act in respect to State banks moving into the national system." *See* S. Rep. No. 1104, 81st Cong., 2d Sess., *reprinted in* 1950 U.S. Code Cong. & Ad. News 3012, 3014. The National Bank Act, 12 U.S.C. § 34a provided that "the consolidated association shall be deemed to be the same corporation as each of the constituent institutions."

4. Ex Parte Worcester County National Bank, 279 U.S. 347, 49 S. Ct. 368, 73 L. Ed. 733 (1929).

nized with the requirement that the state bank be merged into the national bank by limiting the former provision to the purpose for which it was adopted. Utilized to protect the operation of the consolidated bank and, so far as consistent with federal and state law, its enjoyment of all rights and privileges of the state bank, it usefully serves its intended office. Incidentally, it assists in answering such collateral but related questions as to whether or not a fiduciary's exchange of stock of a constituent state bank for the stock of the consolidated national bank is a change of investment beyond his authority. Thus limited, it can be harmonized with the clear intendment of other provisions of the statute without impairment of its usefulness in the areas in which it was intended to operate. [*Id.* at 959 (footnote omitted).]

Financial Institutions Article, § 3-712 (c) (1) does not prevent a transfer by operation of law from having taken place in the instant merger.

Shifting from statutory to case law grounds, Citizens urges that the significance of the "identity of an entity before and after a transaction" is illustrated by *Ruberoid Co. v. Glassman Construction Co.,* 248 Md. 97, 234 A.2d 875 (1967). Claim was made by the material supplier to a subcontractor on a public school construction project against the general contractor's payment bond surety. Under the condition of the bond it was necessary for the claimant to have a direct contract with a subcontractor of the general contractor. At the time the subcontract was made the subcontractor was a sole proprietor. The materials were ordered after the subcontractor had incorporated his business and were ordered in the name of his corporation. Because the subcontract contained a covenant not to assign without the written consent of the general contractor, the surety contended that the claimant had a direct contract only with the corporation, but not with the sole pro-

prietor-subcontractor. We rejected this argument and said that " 'if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract.' " *Id.* at 104, 234 A.2d at 879 (emphasis omitted) (quoting *Trubowitch v. Riverbark Canning Co.,* 30 Cal. 2d 335, 345, 182 P.2d 182, 188 (1947)). Because the purpose of the prohibition against assignment was to assure the general contractor that the work would be performed by a subcontractor who was believed to be competent, we said that the interests of the general contractor were not defeated by accepting the assignment as valid. *Ruberoid* recognized that while an assignment had occurred, it was not an assignment which breached the nonassignment clause of the subcontract. In the instant matter, there has been a change in ownership, and not merely a change in the legal form of ownership. The leasehold interest in Barlow's realty has been transferred to a different corporation which is controlled by stockholders other than those who controlled Century.

Citizens next contends that, in view of the common law policy against restraints on alienation, the nonassignment clause of the subject lease should not be construed as embracing transfers effected by merger. The rule that Citizens seeks would require transfers by merger to be mentioned specifically in order for them to be brought within a covenant not to assign, even if the covenant by its terms includes assignments by operation of law. In other words, Citizens argues that the general expression, "assignments by operation of law," should not include one particular, the assignment that is effected by the operation of a corporate merger statute.

The policy against restraints on alienation does not flatly prohibit nonassignment clauses, but it subjects them to strict construction. 1 American Law of Property § 3.58, at 301 (1952). "Thus, a covenant not to assign does not prevent the lessee from subleasing, a covenant not to sublease is not broken by an assignment, and a provision against

subleasing the premises is not broken by a sublease of a part of the property." *Id.* (Footnotes omitted.) This area of real estate law, in actual practice, reflects the efforts of draftsmen on behalf of landlords to close the loopholes created by the strict construction approach. *See* Kehr, *The Assignability of Commercial Leases,* 9 Real Est. L.J. 197, 201 (1981). Thus, paragraph 19.01 of the subject lease applies to assignments and to sublettings and in both instances as to all or any part of the premises. With respect to mergers as assignments, at least one court has held that a merger effected "a voluntary transfer, synonymous with assignment," and breached a nonassignment covenant which in that case was one that did not expressly include assignments by operation of law. *Feeley v. Harwood Electric Co.,* 22 Luzerne Leg. Reg. 314, 317-18 (Pa. C.P. 1923). On the other hand, *Dodier Realty & Investment Co. v. St. Louis National Baseball Club* and *Segal v. Greater Valley Terminal Corp.,* both *supra,* while dealing with lease clauses which did not expressly include assignments by operation of law, reached the conclusion that the clauses there involved were not breached by merger transfers. Their rationale is described and commented upon in 1 M. Friedman, *Friedman on Leases* § 7.303e2, at 183-84 (1978).

> These hold merger of the tenant is no breach of a covenant against assignment. They accomplish this by a two-step logic (which is almost a pun). They treat merger as an assignment by operation of law, and then invoke the rule that a transfer by operation of law is no breach of a covenant not to assign. However, "the operation-of-law doctrine was based on the theories that nonassignment clauses are intended only to reach voluntary acts of the lessee, and that 'transfers by operation of law' are always involuntary," *i.e.,* death of the tenant, levy of execution, involuntary bankruptcy. This farfetched if not false analogy brings these cases within the rule of strict construction of nonassignment clauses, to avoid forfeitures of leases. This result was char-

acterized as not unreasonable on the ground of consistency with the provisions of merger statutes that no interest in property is to be impaired by merger. This is hardly a reason for overruling a restriction against assignment, to the extent that a lease clearly imposes such restriction. If these leases had forbidden assignment by operation of law the mergers would presumably have been a breach. [Footnotes omitted.[5]]

Because of the *Dodier* type of analysis, landlords' attorneys insert language to include assignments by operation of law in their nonassignment clauses, particularly with corporate tenants. *See* M. Lieberman, *Effective Drafting of Leases for Real Property,* at 213 (1956). The nonassignment clause used by Barlow and accepted by Century in the lease of the subject premises may be characterized as of the strict type. Its inclusion of assignments by operation of law embraces transfers by merger. Had Century desired a more liberal clause from a corporate tenant's standpoint, it was incumbent on Century to obtain it by negotiation. There is no shortage of suggested forms for liberal nonassignment clauses in the "how to" literature. *See, e.g.,* M. Friedman, *Commercial Real Estate Leases,* at 638-40 (P.L.I. 12th ed. 1981); 1 M. Friedman, *Friedman on Leases* § 7.303e3.[6]

---

**5.** There is an indication to the contrary in Bangert v. Boise Cascade Corp., 527 F.2d 902 (8th Cir. 1976) on which Citizens relies. Landlords, who had lost the subject property in a mortgage foreclosure, sued for damages from the surviving corporation in a merger with the tenant which had been consummated seven years previously. The claim rested on breach of a nonassignment clause which included assignments by operation of law. Judgment was for the defendant. The reported opinion on the landlord's appeal reflects that the trial court judgment was based on five grounds: the assignment was not proscribed by the lease; plaintiffs had failed to mitigate damages; plaintiffs had waived the breach; the lease was extinguished by the foreclosure of the fee; and the claim was barred by the statute of limitations. Affirmance was placed solely on the statute of limitations ground. The trial court opinion is not reported so that we are unenlightened as to the rationale for the conclusion that there was no breach.

**6.** Although the transfer of stock by a corporate lessee may have the effect of an assignment of the lease, there is no transfer of the leasehold by the corporate tenant. Generally the sale of stock is held not to be within a nonassignment clause. *See* Alabama Vermiculite Corp. v. Patterson, 124 F. Supp. 441 (W.D.S.C. 1954); Ser-Bye Corp. v. C.P. & G. Markets, 78 Cal. App.

Against this background, we reject Citizens' invitation to apply the rule of strict construction so stringently as to carve merger transfers out of the "operation of law" language of the subject clause. The process of strict construction ordinarily does not accommodate treating transfers by merger differently than other transfers by operation of law, for example, involuntary bankruptcy or execution. To do so would cloud the effect of "operation of law" language and raise doubts as to whether it has any vitality at all. It is desirable that the parties to commercial lease negotiations be able to use language with a relative degree of confidence in it bearing its accepted meaning in the context. The time to change the effect which proposed lease language carries is in the negotiation stage. We shall not further unsettle what is already a complex and formalistic subject matter by judicially imposing, after the fact on this signed lease, a forced strict construction applicable only to merger transfers.

The final contention submitted by Citizens is that this Court should adopt a standard of commercial reasonableness as a limitation on the exercise of a landlord's right to refuse to consent to an assignment that falls within a nonassignment clause. The procedural difficulty is that this argument was not presented to the trial court for decision. Md. Rule 885. This case was bifurcated for trial. The issues as to lease interpretation and termination were submitted to the court for legal decision on a stipulation of the basic facts which did not address the reasonableness, vel non, of the refusal to consent. The issue as to Citizens' liability was resolved by consent. No further evidence was presented to

---

2d 915, 179 P.2d 342 (1947); Richardson v. La Rancherita La Jolla, 98 Cal. App. 3d 73, 159 Cal. Rptr. 285 (1979); Branmar Theater Co. v. Branmar, Inc., 264 A.2d 526 (Del. Ch. 1970); Burrows Motor Co. v. Davis, 76 A.2d 163 (D.C. 1950); Posner v. Air Brakes & Equipment Corp., 2 N.J. Super. 187, 62 A.2d 711 (N.J. Ch. 1948); Rubenstein Bros. v. Ole of 34th Street, Inc., 101 Misc. 2d 563, 421 N.Y.S.2d 534 (1979); cf. Associated Cotton Shops, Inc. v. Evergreen Park Shopping Plaza of Delaware, Inc., 27 Ill. App. 2d 467, 170 N.E.2d 35 (1960) (clause giving landlord option to terminate if a majority of the shares of the corporate tenant were transferred). In the instant matter, the lease reflects that Barlow recognized a transfer of ownership of Century by a sale of stock was not within the nonassignment clause and attempted unsuccessfully to obtain proposed paragraph 19.02 which would have covered a sale of stock as well.

the trial court.[7] Final judgment was thereupon entered. As a consequence, the reasonableness issue, which Citizens had raised in its trial court legal memorandum (but not in its petition for declaratory judgment), simply dropped out of the case.

A further difficulty with this argument by Citizens is that it is counter to *Jacobs v. Klawans,* 225 Md. 147, 169 A.2d 677 (1961). We there said that "the right of the lessor to select a lessee of his own choosing to occupy and use his property offsets, if it does not outweigh, any evils flowing from the enforcement of the restriction on alienation," and that the landlord in that case had a right to refuse giving consent "even if we assume that such consent was withheld arbitrarily and unreasonably." *Id.* at 152, 169 A.2d at 679. Citizens points out that Restatement (Second) of Property, § 15.2 (2) (1977) has embraced the minority position that a "landlord's consent to an alienation by the tenant cannot be withheld unreasonably, unless a freely negotiated provision in the lease gives the landlord an absolute right to withhold consent."

If the common law rule applied in *Klawans* is to be reconsidered, it will have to be done on a record which preserves the question for review.

> *Judgment of the Circuit Court for Montgomery County affirmed. Costs to be paid by The Citizens Bank & Trust Company of Maryland.*

---

7. At oral argument Barlow's counsel stated that a subway station is now located 100 feet from the premises.